ZENO LEINEN, appellee, v. HERMAN H. BOETTGER, appellant.

No. 47683.

(Reported in 44 N.W.2d 73)

SEPTEMBER 19, 1950.

Page & Nash, of Denison, and White & White, of Harlan, for appellant.

Fred Louis, Jr. and Bennett' Cullison, both of Harlan, for appellee.

BLISS, J.—At the close of plaintiff's testimony, defendant moved for a directed verdict. The motion was overruled. At the close of all the testimony, defendant renewed his motion to direct. It was again overruled. After the jury had returned a verdict for $14,000 for plaintiff, the defendant filed a motion for judgment notwithstanding the verdict for plaintiff. This motion was denied. The ground of each motion was that plaintiff had not established his freedom from contributory negligence, and because of said failure the court should have so found as a matter of law and entered judgment for defendant, and erred in not sustaining each motion.

Though error was assigned on the ruling on each motion, the single matter presented on this appeal is the issue of contributory negligence. Since that issue must be determined very largely by the facts, we will review the pertinent evidence in some detail. The unfortunate occurrence in which the injuries were sustained was a little after four o'clock in the afternoon of March 10, 1947, about three miles west of Harlan, Iowa, on primary highway No. 39—an east-west road surfaced with a concrete pavement twenty feet wide—at a place where it was intersected at right angles by a north-south dirt secondary road. It had been raining some earlier that day and, while it had quit, there was some fog and mist in the air and the pavement was damp and the shoulders on each side of the pavement were soft and muddy. The dirt road was muddy and slippery

and considerable mud had been carried onto the paving at the intersection, and there was mud in a lesser amount on the pavement for some distance on each side of the intersection. Defendant testified that there was more mud on the pavement at the intersection than one hundred feet west of it.

The testimony does not all harmonize, but, as we are required to do, we present the evidence and consider it in the aspect most favorable to the plaintiff, against whom the motions were made.

We set out a tracing of the intersection and highways contiguous from a surveyor's plat:

Each highway at the intersection and for some distance on each side of it passed through deep cuts caused by cutting

through the top of a hill. The walls of the cut in each road were high and abrupt and one traveling either direction on either road had little view of the other until he entered the intersection. There was some fall in the grade of the paved road to the east through the intersection.

Plaintiff was driving his two-door Chevrolet sedan east on No. 39 toward Harlan. His thirteen-year-old boy, James, was sitting in the front seat between the father and the latter's sister-in-law.

The trial was begun on September 19, 1949. Because of a permanent injury to his brain, suffered in the mishap, the plaintiff had retrograde amnesia causing him to have no memory of anything that took place. For that reason he was not a witness.

The defendant, Boettger, forty-three years old, lived a half mile south and a half mile west of the intersection on a farm on which he had lived from birth. His five-year-old daughter attended a school near the northwest corner of the intersection, about one hundred feet north of the pavement and sixty feet west of the dirt road. The pupils were dismissed at four o'clock, and he drove his Plymouth sedan a half mile east on a muddy dirt road and then drove north a half mile and crossed No. 39 at the intersection and drove north to get his daughter and a neighbor's daughter of seven years to take them to their homes. He first testified that he drove north and stopped his car with its rear end twenty feet north of the north edge of the pavement, and waited for the children, whom he saw walking down the road. Later he testified the distance was twenty or thirty feet. The paved road, No. 39, being a primary road, was a through highway (section 321.350, Code, 1946) and required "Stop" signs on intersecting crossroads (section 321.345, Code, 1946) and required all vehicular traffic on an intersecting road to stop before entering or crossing the through highway (section 321.1, subsection 53, Code, 1946). The statutory "Stop" signs had been erected on the dirt road on each side of the intersection. The stop sign north of the intersection was sixty feet from the north edge of the pavement and ten feet west of the traveled way of the north dirt road. The stop sign south of the inter-

section was similarly located on the east side of the south dirt road.

Defendant testified:

"I stopped north of the paving where the stop sign is. I imagine it's about twenty-five feet from the pavement. It would be north of the paving and on the west side of the road. I think the stop sign was pretty near across from where I was seated in the car. As I drove across the pavement on No. 39 that day to get off the pavement I drove onto the west side on the road a little north of the pavement. As I backed up toward the pavement I come right down the west side because the center and all that was one **big mudhole.**"

The court reporter then noted, as stated in the printed record during defendant's direct examination:

"The witness thereupon drew a red mark upon the plat, Exhibit 3, commencing at a point just east of the stop sign shown north of the intersection, around toward the mailboxes which are designated on the plat."

The mailboxes—there were three on March 10, 1947, and two at the time of the trial—were just outside the shoulder and about ten feet north of the pavement and fifty feet west of the center of the intersection. Continuing his testimony, defendant stated:

"I backed south and west. I backed up until I could look back into the road; then I looked west, I couldn't see anything coming so I backed the two south wheels onto the pavement, then I stopped and I saw this car coming. It was coming from the west. I looked before I backed onto the paving. I stopped before I backed the car onto the paving. When I looked west I did not see any car coming, and then proceeded to back onto the paving. When I backed onto the paving my car was south about two feet from the north side of the paving and was about parallel with the paving, when I stopped and—why, here it was coming. It looked to me like it would be five or six hundred feet away when I first saw it and it continued to come toward the place where I was. I would say it was coming 60 or 65

miles an hour. I stopped my car just practically south of the mailboxes. The back end of my car was a little west of the mailboxes. When I backed up I looked west and I could always see east as that was in front of me. I turned around to look west. I watched the car from the time when I first saw it, and as it approached it just seemed he turned off a little too far; when he got off the shoulder, why, the mud first took him along, he just kept going out and out. As this car approached me it did not slow down; I didn't hear any horn sounded from this car. It went off the paving about 75 to 100 feet west of my car. I saw the Leinen car coming down the road and there wasn't any obstruction to my view. I had seen the mud on the paving. After I backed from the north I stopped with my two left wheels on the shoulder and my two right wheels on the pavement. I backed the car around to the west. I was going to take the children home. I was going to maneuver the car where I could get in position where I could drive south, forward, on the road that is south of the intersection. I didn't back all of my car onto the highway, just part of it. After Mr. Leinen drove by and upset I pulled across the pavement and looked to see if anything was coming. Before he drove by I was just waiting on the shoulder and the pavement. I didn't hear Leinen's horn sounded."

The witnesses for the plaintiff, as to the movements of the two cars, were James Leinen, thirteen, son of plaintiff, R. B. Summerson, Chief Machinist's Mate, on recruiting duty for the Navy, who drove a Navy station wagon to the intersection on No. 39 from the east as the defendant approached the intersection, and Mrs. Hawn, wife of a Methodist minister, who was riding in the Navy station wagon.

James, the minor son, sat in the front seat by his father. James was sixteen years old at the time of the trial and in eleventh grade at school. He was learning to drive a car in March 1947, had often ridden with his father, and sometimes over this same road into Harlan. He testified that as they were traveling along he observed the road ahead and that just prior to passing the defendant's car his father was driving at a speed of about forty miles an hour; he first observed the defendant's

car when their car was about one hundred feet from the intersection:

"It was then at the north edge of the highway. After I first saw it, it started backing. It kept right on coming. Clear across the highway. It backed across the highway and we kept honking and he kept on coming so we swerved around it. By 'we' I mean 'he', my father. He went around on the south side. He had to go off on the shoulder with all four wheels. At the time my father's car passed the other car, it was about a half a foot to a foot to the edge, from the south edge of the paving. There was not room on Highway 39, on the south side of this car for my father to pass and stay on the highway. At no time after I saw the car backing onto the highway did it stop or check its backward motion until we passed. I remember my father started to drive the car back on the highway, and then all I remember is that I was running up the farmhouse lane. I felt no motion checking the car as we were proceeding on the shoulder of the road. I do not know what the car did after it passed the Boettger car. I knew it turned over but I didn't know how or anything. The Boettger car was traveling about five miles an hour as it backed out of the side road from the north. At the time of the accident it was not raining but it was starting to mist. The pavement was damp and the shoulder on the south side of the road was muddy all over where it had frozen and thawed. I did not hear Boettger sound his horn as he backed out onto the highway. I heard no other horn than the one on my father's car. I did not see Boettger make any signal as he backed onto the highway. When the Boettger car backed across the pavement it backed to the southwest. As we passed it the front end of the car was right by the north edge of the pavement. We were watching the road all the time as we drove along there. The brakes on my father's car were good as they had just been relined. From the point 100 feet west of where we first saw the Boettger car it is downhill to the east. After the accident Mr. Boettger said to me, 'the darned fool was going 90 miles an hour' and I replied, 'that car won't go that fast.' "

Mr. Summerson testified that as he was driving the Navy station wagon going west on No. 39 on the afternoon of March 10, 1947, another recruiting officer sat in the front seat with him, and Mrs. Hawn and her son were riding as passengers in the second seat as the car approached the intersection from the east. When he was two hundred or two hundred fifty feet east of the intersection or about thirty or forty feet east of the Miller farm lane on the north side of the pavement, he saw the Boettger car:

"When I first saw the Boettger car it was on the north side of No. 39. It was backing from that intersection south when we first noticed it. I did not see it stop at any time before it went onto the paving. The back wheels went onto the paving and then it turned in a southwesterly direction mostly south across the highway. Its motion was not checked at any time after I saw it. It backed to within a foot to a foot and a half of the south edge of the highway. I think when Boettger backed out we were just a little to the east of the intersection. He was going about five miles per hour. He might have been going a little slower or a little faster. I observed him as he backed out. He was not looking to the rear or west at the time I observed him. There were children standing between the front and the back seats in his car. I did not see Mr. Boettger make any signals at the time he backed on the highway. He was wearing a cap with ear flaps down.

"My attention was first attracted to another car by the sounding of a horn. We heard the horn before we could see the other car and the first I noticed the other car was as I imagine would be the right fender and part of the radiator come from behind the other car backing out, on the shoulder of the road. The other car was coming from the west. It was off on the south shoulder of the road with all four wheels as it passed the Boettger car. The rear end of the Boettger car was so close to the side of the car coming from the west at the time it passed that we expected to see them hook; that the other car was going to hook it because he was off on the shoulder with all four of his wheels when he came by there. When he first appeared it looked like they were going to hook. It couldn't

have been more than a foot or a foot and a half at the most. There was not room on the highway at the time the car passed the Boettger car for it to pass on the highway. As the Leinen car passed the Boettger car it was off the highway and Mr. Leinen seemed to have it under control. There were no slips, but he was quite tense at the wheel. That is what I remember most * * * he was really tense holding this car under control. It did not skid while it was on the shoulder of the paving. After it passed the Boettger car it continued on this shoulder for a short distance about a little past midway of the intersection into which we were coming. He tried to get it back onto the pavement, and in so doing it went over on its radiator and onto the top of the car and it slid down the highway for a short distance and came to a stop directly across from the Miller driveway, lying on its top with the wheels in the air and the hood towards the west, on the north side of the highway. * * * I would say the speed of the Leinen car after I saw it passing the Boettger car was about 40 to 45 miles an hour. It seems to me the Boettger car was at a stop when we saw Leinen's car coming by."

Mrs. Hawn testified:

"We all [in the station wagon] had a perfect view of the road. When I first saw the car it was backing onto the road toward the southwest. It didn't pause, but he wasn't going fast, he just backed out very deliberately. The car was not stopped as it backed onto the highway. He backed farther onto the pavement. He was in our lane of traffic to begin with, then he backed into the other lane of traffic but he was still—he was kind of in both lanes of traffic. As we proceeded up the road toward the west, I heard a horn sounding, very stridently. Shortly thereafter I saw another car coming up from the west in the other lane of traffic, and had turned out and tried to pass the other car. It passed the other car and did not strike it. The Leinen car was south of the Boettger car when it passed, out on the shoulder.

"Boettger was turning the back of his car to the west as he backed out. He didn't stop until he got onto the pavement. He stopped before the Leinen car passed. The Boettger car was

between us and the Leinen car, but things were happening pretty fast. It could have been moving a little and I wouldn't have known it.

"I do not know how fast the Leinen car was coming when I first saw it. I drive a car. I have said it was not coming as fast as we were, but I don't know how fast he was coming. I thought it was a moderate rate of speed. I wouldn't say it was slow, but I wouldn't say it was fast. I would have no idea how many miles per hour it was. Mr. Boettger was wearing a cap with the ear tabs turned down at the time."

The sheriff testified that the distance from where the Leinen car turned onto the shoulder until it came to rest after overturning was two hundred fifty-seven feet.

Boettger testified that when you are traveling east eight or nine hundred feet west of the intersection you can see an automobile at the intersection coming from the north.

I. We are fully convinced from a reading of the evidence and consideration of it in the aspects most favorable to the defendant that the trial court was right in its decision. The jury necessarily found that the negligence of the defendant was the proximate cause of the injuries of the plaintiff, and since the defendant makes no issue of his negligence we will consider it only for its bearing upon the mental attitude and the conduct of the plaintiff.

The jury may reasonably have found under the evidence that the defendant, on his return from the schoolhouse, approached the highway intersection quite oblivious of the law and of the rights of other travelers upon the primary highway. He had lived within a short distance of it all of his life and knew all of the surrounding conditions. He did not approach the intersection on the beaten way of the dirt road at right angles, but in a diagonal southwesterly direction, and reached the paving fifty feet west of the north-south center line of the intersection, near the mailboxes, which were about ten feet north of the pavement. His route took him along the foot of the high bank of the cut in the dirt road, which completely concealed him from the view of one traveling east on primary highway No. 39 until Boettger entered it. We have identified this route

by the curved line with the intersecting crossmarks on the tracing of the plat shown herein. Plaintiff's Exhibit 1, identified by the sheriff, clearly shows that an eastbound traveler would have no view of a car coming from the north until just before it entered the paving. Although the Navy station wagon was in plain view of the defendant, and he admitted he could have seen it, yet he testified that he never saw it until he stopped his car down on the dirt road south of the intersection and came back to the overturned car. His conduct was such that Mr. Summerson thought Boettger was leaving the place without stopping, and he told Mr. Gardner (the other recruiting officer) to get Boettger's car number. Although plaintiff's horn was being sounded, as testified by James Leinen and Mr. Summerson, and "stridently" so, as Mrs. Hawn said, the defendant said he never heard it. His ears were covered by the flaps of his cap. Mr. Summerson and Mrs. Hawn, who were in a better position to see than Jimmie Leinen, testified that Boettger never stopped or paused as he entered No. 39, and did not stop his car until almost across the south lane of the pavement, thereby practically blocking the pavement. Defendant said that he did not see plaintiff's car when he stopped before entering the intersection and that then he backed his car west, half on and half off and parallel with the pavement, and as he stopped it, with the rear just west of the mailboxes, "why, here it was coming." He had backed his car only fifteen feet, according to his testimony and the red line which he marked on the plat. At five miles an hour it took him two seconds to travel this fifteen feet. When he first looked he had a view of nine hundred feet and saw no approaching car, and when he stopped his car and looked the plaintiff was about five hundred feet away. And, as he testified: while "I was just waiting on the shoulder and pavement" for the car to drive by, the driver of that car with a clear pavement approximately seventeen feet wide ahead of him left the pavement seventy-five or one hundred feet west of the defendant and drove his car onto a soft, muddy, slippery shoulder. The credibility of defendant's story was for the jurors, and it would be surprising if they believed it.

Contrary to the testimony of the witnesses in the station wagon, the defendant testified that he stopped his car. The

Leinen boy corroborated defendant in this. We will assume that defendant did stop. If the boy saw him stop it is reasonable to assume that his father also saw him stop, and assumed that the defendant saw *him*. To give defendant further warning he sounded the horn of his car, and continued to sound it as defendant proceeded across the paving. The plaintiff could reasonably assume, and probably did, that defendant knew that primary highway No. 39 was a through highway, and that for that reason and also because he was then closely approaching the intersection from defendant's right, that defendant would stop and also remain stopped until he could proceed with reasonable safety, as provided by section 321.313, Code, 1946. Summerson and James Leinen, each of whom claimed some ability to estimate the speed of a moving car, said the plaintiff's car was traveling at the rate of forty miles an hour. Mrs. Hawn, who drove a car, but who was reluctant to give an m.p.h. estimate, did have knowledge of slowness and speed, and said that plaintiff's car was traveling at a moderate rate of speed, neither slow nor fast.

With the defendant's car stopped at the north edge of the pavement, the jury could reasonably and rightly find, under said evidence and under the law, that the plaintiff was not negligent in the operation of his car with respect to speed, or otherwise. Assuming that the defendant would remain stopped until he passed, the plaintiff might continue at the speed he was traveling, and the jury would be justified in so finding. Plaintiff was not required to do otherwise until he ascertained that defendant was going to proceed across his path. When defendant did so the plaintiff was confronted with a sudden and serious emergency requiring an immediate change in the operation of his car. He had the choice of trying to stop his car and avoid a collision or to drive past on the shoulder. Either way was hazardous. He discovered then that the paving ahead was wet and splashed with slippery mud, and he rightly feared that any effective tightening of the brakes might cause the wheels to slide or the car to swerve and still not avoid a collision and serious injury or death to those in his car, and to the defendant and the two little girls in that car. Going to the shoulder afforded a reasonable chance of avoiding a collision

and harm to the occupants of the defendant's car with a fairly debatable hope of safety to Jimmy, his sister-in-law and himself. He took this course. He avoided the collision and harm to defendant and the children, and, although the testimony of Summerson and the sheriff shows that he drove a straight and true course in the muddy shoulders of the two highways, he was unable to return in safety to the pavement.

II. Defendant contends that plaintiff violated: section 321.285, Code, 1946, relating to rate of speed and the control of a motor vehicle; section 321.288(3), relating to speed when approaching and traversing intersections; section 321.364, relating to the control of a motor vehicle while traveling through defiles, and on approaching the crest of a hill; and, irrespective of these statutory violations, which constituted contributory negligence as a matter of law, the plaintiff was guilty of contributory negligence in driving at too high a rate of speed under the circumstances; in failing to keep a proper lookout; in failing to see defendant's car backing to and onto the pavement; in failing to have his car under control; in failing to decrease speed; and in failing to stop his car.

Without conceding the fact of any of these violations or discussing them further, it is our firm conclusion that the issue of plaintiff's contributory negligence, or, more properly speaking, his failure to establish his freedom from contributory negligence, was a question for the jury and was rightly submitted to it.

We call attention to a misconception of fact which defendant stresses in his opening printed argument, and repeats in his printed reply argument. We quote from the latter:

"We have here a rather unusual situation. The appellant's car, from its position where it had stopped twenty feet north of the pavement, could be seen continuously from a point about eight hundred feet west of the intersection. As it backed to the south toward the pavement it was also in plain view of the appellee coming from the west, if he were eight hundred feet from the intersection."

The testimony of defendant, the exhibits, particularly Exhibit 3, the engineer's plat, drawn to a scale of one inch equals

fifty feet, and the photographs, Exhibits 1, 2 and 12, establish that the statement is not true. It is a fact that defendant varied some in his testimony as to where he stopped his car to wait for the children. But when he was given a red pencil, while being interrogated by his lawyer on direct examination, and was asked to mark the course of the route that he had backed the car he tied himself to something definite and tangible. By scaling his red mark on the plat it appears that in backing his car from just east of the north stop sign to just beyond the mailboxes his car traversed a distance of approximately ninety feet, of which all but about twenty feet was in the shadow of and along an overhanging bank several times taller than an automobile, and surmounted by trees and shrubs, which effectively screened defendant's car from any view for even a short distance west of the intersection. And this would have been true had defendant stopped his car with its rear end but twenty feet north of the intersection. And furthermore, the defendant did not testify that a person traveling east eight hundred feet west of the intersection could see an automobile while it backed from the north stop sign, but he testified that such a traveler could see an automobile *at the intersection* coming from the north. The photograph, Exhibit No. 1, gives the true picture of the view that was in front of Jimmy Leinen and his father as their car approached the intersection from eight hundred feet west to the place where it was driven onto the south shoulder. On the tracing of the plat which we have made, the figure 478 at its east or right side and the figure 477 west of the intersection represent the station marks placed in the concrete in constructing the pavement. They were placed one hundred feet apart. Had space been available the figure 476 would have appeared at the extreme left or west side of the tracing. In Exhibit No. 1 the camera was placed about two hundred feet west of the center of the intersection facing east. The only objects shown are the mailboxes sixty feet west of the center of the intersection and ten feet north of the pavement. No car coming down the dirt road could have been seen until it was within ten feet of the paving. According to the measurements of the sheriff, who arrived shortly after the accident, plaintiff's car traveled two hundred fifty-seven feet from where it went onto the shoul-

der to where it came to rest opposite the entrance to the Miller farm lane east of the intersection. That point was one hundred seventy-five feet east of the center of the intersection, so that plaintiff drove onto the shoulder eighty-two feet west of the center of the intersection. Defendant backed his car down the west side of the dirt road and entered the pavement fifty feet west of the center of the intersection. That is his testimony. Jimmy and Mr. Summerson and Mrs. Hawn testify that defendant did not back his car down by the mailboxes and half off, and parallel with, the pavement, but that he drove diagonally southwest almost across the pavement. These measurements of the sheriff, a disinterested witness, prove that defendant's car was but thirty feet or less in front of plaintiff's car when he drove it with all wheels entirely off the paving to avoid defendant's car.

Plaintiff was indeed faced with a suddenly appearing and gravely imminent danger to the occupants of both cars. He had but an instant to plan and act. Counsel for defendant say that plaintiff was panic stricken. The jury might well have found that his avoidance of a collision was executed as by one in the coolest composure. It is a well-settled principle of law that when the element of unexpected danger suddenly appears one is not held to the same degree of judgment that would otherwise be required. Stokes v. Sac City, 162 Iowa 514, 523, 144 N.W. 639. One cannot by his negligence put another in danger and excuse himself from liability on the ground that the injured plaintiff did not use good judgment in extricating himself from the peril so put upon him. Lundien v. Fort Dodge, D. M. & Sou. Ry. Co., 166 Iowa 85, 90, 147 N.W. 308; Zellmer v. Hines, 196 Iowa 428, 432, 192 N.W. 281. One put in imminent peril by another, which may be met in two or more different ways, is not to be held guilty of contributory negligence, as a matter of law, simply because he chose the more hazardous course. Johnson v. Plymouth Gypsum Plaster Co., 174 Iowa 498, 511, 156 N. W. 721.

In McKern v. Wabash R. Co., 195 Iowa 410, 412, 192 N. W. 152, 153, the court, by Justice Weaver, said:

"Perfect care or judgment is not given to mankind, and if a person exposed to danger conducts himself with the caution which may reasonably be expected of a person of ordinary prudence and ordinary presence of mind, he is not to be charged with fault, even though, as a matter of cool afterthought or mature consideration, he might better have done otherwise." (Quoted in Beach v. City of Des Moines, 238 Iowa 312, 320, 26 N.W.2d 81.)

In Kern v. Des Moines City Ry. Co., 141 Iowa 620, 631, 632, 118 N.W. 451, 455, Justice Deemer, speaking for the court, said:

"If it [defendant] created the peril, it cannot be heard to say, 'Well, you [did] not act discreetly in avoiding it.' The law takes account of the impulses of humanity when placed in dangerous and hazardous positions, and does not expect thoughtful care from the persons whose lives are thus endangered. * * * We need not cite cases in support of the principle that where one places another in a position of peril, he has no right to expect circumspect conduct. In such circumstances it is for a jury to say whether or not the other party acted with that thought and prescience that one placed in a dangerous position was likely to adopt, and whether under all the circumstances he was negligent. *Indeed the better rule here is that, if a defendant by his own negligent acts throws one off his guard or puts him in peril, the conduct of the person placed in the perilous position will not be regarded as contributory negligence under any circumstances.* See Beach on Contributory Negligence, sections 67, 68, and cases cited." (Italics ours.)

The quotation has been repeated with approval in Phelan v. Foutz, 200 Iowa 267, 271, 204 N.W. 240 (Albert, J.), and in Elmore v. Des Moines City Ry. Co., 207 Iowa 862, 869, 224 N.W. 28 (Wagner, J.).

Other decisions of like import to these and under similar circumstances are: McKinnon v. Guthrie, 221 Iowa 400–403, 265 N.W. 620 (Richards, J.—in which it was held that a speed of forty to forty-five miles an hour on a country road was not contributory negligence as a matter of law); DeBuhr v. Taylor, 232 Iowa 792, 797, 798, 5 N. W.2d 597 (Mitchell, J.—speed of

forty to forty-five miles an hour on a country road was held for the jury on the issue of contributory negligence. There was a dissent, but it was on another point); Carstensen v. Thomsen, 215 Iowa 427–433, 245 N.W. 734, and May v. Hall, 221 Iowa 609–615, 266 N.W. 297, where our lately departed and beloved colleagues Justice Truman S. Stevens and Justice W. H. Hamilton, respectively, ably discussed the proposition.

We are abidingly convinced that the case was rightly submitted to the jury and that its verdict was sustained by the evidence. It needs no citation of authority that the issue of freedom from contributory negligence on the part of the plaintiff is usually one of fact and not of law and is peculiarly and ordinarily for the determination of the jury, and that it is only in the rare and exceptional case and where the lack of reasonable care is so manifest, flagrant, palpable that reasonable minds may fairly reach no other conclusion, that the question is one of law for the court. It is ordinary care, and not the highest degree of care, that is required. See Kinney v. Larsen, 239 Iowa 494, 498, 31 N.W.2d 635; Toney v. Interstate Power Co., 180 Iowa 1362, 1378, 163 N.W. 394; Markle v. Chicago, R. I. & P. Ry. Co., 219 Iowa 301, 308, 257 N.W. 771; Pierce v. Dencker, 229 Iowa 479, 484, 294 N.W. 781; Beman v. Iowa Electric Co., 205 Iowa 730, 735, 218 N.W. 343; Johnston v. Johnson, 225 Iowa 77, 83, 279 N.W. 139, 118 A. L. R. 233; Huffman v. King, 222 Iowa 150, 154, 268 N. W. 144; Fitter v. Iowa Telephone Co., 143 Iowa 689, 693, 694, 121 N.W. 48.

We question whether the facts make the "assured clear distance" statute (section 321.285, Code, 1946) applicable, or that section 321.288, Code, 1946, always requires an actual reduction of speed. Only reasonable and proper speed under the circumstances is required. Smith v. Pine, 234 Iowa 256, 264, 12 N.W.2d 236. It was for the jury to say whether the plaintiff was so driving.

The judgment is—Affirmed.

All JUSTICES concur.