FERD PLATHE, administrator of estate of Joseph B. Plathe, deceased, appellee, v. JOSEPH JUNKERS; DAVID ROSS and JAMES ROSS, dba ROSS MOTOR COMPANY, appellants.

## No. 49062.

(Reported in 79 N.W.2d 324)

NOVEMBER 13, 1956.

REHEARING DENIED JANUARY 18, 1957.

Burton E. Parriott, of Remsen, for appellants.

Orville A. Hames, of Remsen, and Thomas L. McCullough, of Sac City, for appellee.

BLISS, J.—The collision occurred at approximately 7 p. m., July 29, 1953, on an improved gravel north-south highway about four and one-half miles north of Remsen. Mr. Junkers, who lived north of Remsen, had taken his automobile to the Ross Motor Company at Remsen operated by the defendants, David and James Ross, for some repair work, and they permitted him to take an International pickup truck owned by them, for use until his automobile had been serviced. That morning he accepted an invitation by the decedent to ride with the latter in his automobile to Sioux City. They made the trip and returned to Remsen about six o'clock that afternoon, and shortly thereafter Mr. Junkers started for his home in the pickup truck northward on said highway. It was a clear day with the sun shining brightly. Mr. and Mrs. Richard Schiltz, ages respectively 29 and 33 years, operated a farm on the west side of the highway, about four and one-half miles north of Remsen. Mr. Junkers, as a witness for defendants, testified that as he approached this farm he was driving rather slowly because of some road repairs, and when he was directly east of the farm house, about 6:35 p.m., he saw Mrs. Schiltz in the house, which was about 150 feet to the west, and stopped his vehicle on the east lane of the highway and called to her, and she came out of the house and walked toward him about 50 feet, and he asked her to come to his home that evening with Mr. Schiltz and watch television and to plan a fishing trip for the following day;

she replied that she would have to talk to "Rich" about it; just as he started his car and proceeded a few feet, Mrs. Schiltz looked to the south and called "Oh, Joe"; he immediately looked to the south and saw an automobile approaching approximately 180 feet distant at a speed of 65 to 70 miles an hour, and headed somewhat northwesterly toward the end embankment of the Schiltz driveway, but the driver reduced the speed of his car to about 40 miles an hour, and veered to his right past the driveway entrance, and came on directly toward the Junkers car, during which time the witness (Junkers) said he observed the car continuously, and, just preceding or at the time the car struck the left rear fender, he momentarily ducked his head but saw the car continue on by and into the ditch west of the road; the car made a few jumps and rolled once and landed upright facing east with the front wheels on the west shoulder of the gravel road, approximately 110 feet north of where it entered the ditch; the body of the decedent, Joseph B. Plathe, was found about 30 feet north of his car in the ditch on the left or west side of the gravel roadway. Mr. Junkers further testified that: from the place where he had brought his car to a stop on the right-hand or east side of the road, the vision from the south to the north was clear and unobstructed for at least a quarter of a mile; prior to the impact of the collision he was observing the oncoming car but not the driver, and did not know it was Joseph Plathe; "just at the point of impact, I ducked. The car of the decedent was approximately 30 feet away when I came to the conclusion that he was going to hit the pickup, and that is when I started to duck. * * * Mrs. Schiltz and I were the only two people there just prior to the collision. When I was watching the car of the decedent, I had my head out of the left side of the pickup window and when I ducked I pulled my head back into the pickup. The collision did not shake me up. It wasn't that big a jolt. *If the pickup truck had been 20 feet farther to the north, the car of the decedent possibly could have passed me.* I never stepped on the gas in an attempt to move the pickup truck out of the path of the car. *I couldn't have picked up fast enough to avoid the collision.* [Italics ours] * * * I did not drive the pickup truck

after the collision other than to bring it to a stop. * * * I know exactly the point in the road where I first observed the Plathe car immediately prior to the collision, and also know exactly where the pickup truck was when I stopped after the impact. I measured it with a steel tape. It was 180 feet from where I first observed the Plathe car approaching to where the pickup was. I measured in a straight line. The course this car was taking, it actually would have traveled considerably farther than 180 feet. The distance was 108 feet from the north corner post of the Schiltz driveway to the pickup. I observed Plathe's car before it reached the driveway in a northerly direction and for a considerable distance prior to that point."

The pickup truck was left at the place of collision for a considerable length of time, and was then driven farther north by Mr. Junkers and parked on the east shoulder of the road about opposite the disabled Plathe car, which was standing 211 feet north of the north corner post of the Schiltz driveway entrance.

A plat of the highway (Exhibit "A") for a distance of approximately 200 feet both north and south from the north corner post of the Schiltz driveway entrance, showing the ground immediately contiguous, the Schiltz house, the width of the highway, and of the gravel roadway, drawn by a civil engineer, was introduced in evidence by plaintiff. No one questioned its accuracy. It confirms the distances hereinbefore mentioned.

Thomas Soppeland, a State of Iowa patrolman, was at the scene of the collision about 10 p.m. of the day it happened. He returned the next day and took a number of photographic views of the highway, the cars involved, and the Richard Schiltz premises. These were all admitted in evidence without objection, as were also photographs introduced by defendants. He testified to tire marks of decedent's car where it left the gravel road and as it proceeded into the ditch. He also saw a tire mark in the gravel road about where decedent's car went into the ditch. This tire mark was similar to the left rear tire on the pickup truck. The tire mark was about nine feet from the west shoulder of the road. The marks on the contacting sides of each vehicle indicated that they had scraped together for approxi-

mately their full lengths. The witness testified that from the place of the collision "to the south you have a good vision for at least a quarter of a mile or possibly more."

Mr. and Mrs. Richard Schiltz were witnesses for the plaintiff. Richard was a brother of the wife of the decedent. Mrs. Schiltz testified that she was standing in front of the east window of their dining room looking out of the window to the east and saw the collision. Her testimony was: "When I looked out of my window I saw a pickup stopping or coming to a stop and I recognized Joseph Junkers driving it. I didn't see him give any kind of a signal with his arm. I then glanced down for a few seconds and then I heard a crash. I then looked and saw Joe Plathe's car going on the west side of the pickup headed for the ditch. After the crash I ran out to find Joe Plathe. I first looked around the car and in the car. I later saw the body of Joe Plathe in the ditch. He appeared to be dead. I must have heard the pickup or else I wouldn't have looked out. I had not talked to Joseph Junkers prior to the accident that day, nor had I seen him that day prior to the time I saw him in the pickup."

On cross-examination, Mrs. Schiltz testified: "I do not know whether the pickup was stopped or coming to a stop when I looked. I had just looked out when I noticed the pickup stopping or coming to a stop, and then I just glanced down for a few seconds. It was about 7 or a little after when I was looking out the window. It was daytime and still light at the time. The pickup was clearly visible. I first observed the Plathe car when it went around the pickup. It was directly east from my east window."

On redirect examination, she testified: "When I first saw the pickup truck just prior to the collision it was approximately straight east of the house and it was approximately in the same position immediately after the collision."

On a photograph (Exhibit "K") in evidence taken with the camera in a field east of the highway and facing directly west, and showing the highway and the Schiltz house, Mrs. Schiltz drew with a pen a straight line showing the location of the pickup truck on the gravel portion of the highway just east of

the house, where she saw the collision. The grove immediately north of the Schiltz house prevented the witness from seeing but a short distance along the highway north of the place of the collision.

Richard Schiltz, as a witness for plaintiff, testified that he was working about 20 rods northwest of his grove when he heard the crash of the collision and then saw a car come on the west edge of the road or in the ditch and roll over north of the grove. He ran to the house and learned from his wife that it was Joe Plathe's car. He then found the body of the decedent, lying north of his car, and observed the pickup standing on the gravel road east of his house, "where it would have been visible by one coming from the south going north from the top of the first hill." The next morning the witness observed a short, deep imprint on the road which was about 7 to 10 feet from the west edge of the road, and saw "some dirt that apparently came from a car about a foot or two from the imprint." He said this imprint "was about the width of the bottom of a tire, and was the only mark of that type on the road."

Anton Schiltz, the father of Richard Schiltz and of the decedent's wife, lived about three fourths of a mile north of the Richard Schiltz farm home, was informed of the collision by a telephone call from Mrs. Richard Schiltz, and arrived at the place of the collision immediately thereafter. Testifying for plaintiff, he located the position of the pickup truck after the collision in the same place as above noted by Mr. Junkers and Mr. and Mrs. Richard Schiltz. He stated: "When I first saw the pickup it was just a trifle south of the top of the hill. If it had been a few feet more to the north it would have been on top of the hill. The pickup would have been visible for a good block to a vehicle coming from the south and going north. * * * When I approached the Richard Schiltz farmhouse from the north the first thing I saw was a pickup truck right in the center of the road, straight east from the north corner of the house. After I arrived it was moved to the northeast of Joe Plathe's car. I saw Joe Junkers get out of it." On the plat, Exhibit "A", he noted the location of the pickup where he saw it on his arrival, and before it was parked farther north.

Another witness for plaintiff, Vincent Ahlers, with his brother operated a farm near the place of collision. They had leased eighty acres to decedent, who with his wife kept house for the unmarried landlords. Ahlers testified that he examined the road where the collision took place and the tracks of both cars and stated that the plat (Exhibit "A") was an accurate representation of the location of the collision and the evident manner in which it occurred.

This witness also testified: "I talked with Joseph Junkers on the night the decedent was killed, shortly after the accident. He said that Joe Plathe did not hit him, that the dent was in the fender of the pickup truck." Defendants' Exhibit 4 shows the left rear fender of the pickup with a large dent in it. Plaintiff's Exhibit "B", a photograph of the rear of the pickup truck, also shows such a dent. The defendant David Ross testifying for plaintiff, said: "On July 29, 1953, I was the owner of an International pickup truck and on that date gave said truck to Mr. Junkers to drive and he drove the same with my consent. The picture of the truck, plaintiff's Exhibit 'B', was the same pickup truck owned by me at that time and the one Junkers was driving. The dent in the fender was not there at the time I gave it to him to drive but was there when I got the same back in my control again. The dent in the fender on the pickup truck is the only mark I remember as being on the truck when it was returned that was not there when it was taken by Junkers." The witness, Ross, then identified plaintiff's Exhibit "C" and defendants' Exhibit 4 as being photographs of the pickup truck.

The defendant Junkers denied having made the statement to Ahlers, above referred to.

The plaintiff, brother of decedent, testified that he carefully examined the tracks of the two cars and their condition after the collision. The pickup truck was painted red and the decedent's car was blue. He testified: "I saw red paint, the color of the pickup truck on my brother's car and also saw some scratches on it which began at the front door of the pickup and ran to the bumper. I examined the pickup truck and observed a dent in the fender and saw blue paint in the area

of the dent. I measured with my hand and determined that the hub bolts on the truck were the same distance from the ground as the scratches on the car. I checked the road for marks and saw an imprint a foot in length and it was pretty plain. You could see it easy enough. It was a fairly deep mark. It was deep in comparison to the other marks on the road. This imprint was approximately nine feet from the west edge of the road. The imprint was five steps to the south from the point 'A' (place of collision) as shown on plaintiff's Exhibit 'A', which is the point where decedent's car apparently went into the west ditch. I checked the imprint in the road and the tire on the pickup truck and they were identical." At this point the witness examined plaintiff's Exhibit "B" (a photograph of the tire tread on the pickup) and stated that it showed the tread on the pickup truck as being the same as the imprint he saw in the road. He testified that he measured the width of each vehicle with a tape, and found the pickup truck to be six feet five inches wide, and the decedent's car was six feet wide. This witness (plaintiff) on being recalled testified he talked with defendant Joseph Junkers about the accident on August 1, 1953, and Junkers said he did not know how the accident occurred, and then stated: " 'One good thing, the pickup wasn't involved.' "

Mr. Junkers denied making any such statement.

Another witness, Arnold Galles, living in the neighborhood, examined the place of the collision the following morning and observed a tire imprint nine feet in from the west side of the road, and testified: "I noticed a tire imprint in the road that matched the tire on the pickup truck. The tire on the pickup was a mud grip." This witness also testified: "There is a little blind spot between the house south and the Richard Schiltz house and the place where the accident happened, but after you leave the blind spot it is visible for a distance. One could observe it continuously from the next hill."

Defendants used as a witness a court reporter of the Twenty-first Judicial District who took down a question-and-answer statement by Mrs. Richard Schiltz on August 5, 1953. Her statement as to the collision was not materially different

from her testimony as a witness, but she stated that she did not leave the house to talk to Mr. Junkers and that she had no conversation whatsoever with him before the collision. She also stated in this interview "that when she first saw Plathe's car it was passing the pickup and that she heard a big crash and knew it was out of control then."

The photographs introduced by both sides indicate that the highway on which the car of decedent and the pickup truck were moving north was over gently rolling land. Defendants' Exhibit 1 was a photograph of a car parked facing north on the gravel road straight east of the Schiltz house, with the camera facing north 800 feet south of the car. The photographer, as defendants' witness, was asked whether a car so placed would be visible at a greater distance than 800 feet by one coming from the south. His answer was: "Yes. I would say at least a quarter of a mile."

Dr. Floyd Christensen arrived at the place of the collision about 7:20 p.m. shortly after the cars collided. As defendants' witness, he testified: "About a half a mile south of the Richard Schiltz residence I noticed a group of people near a pickup truck on the road ahead of me. Except for a little draw in the road I continued to observe this pickup until I got opposite the Schiltz house. This draw was located about half the distance between the south corner road and the Schiltz residence. In the last half of this distance I observed the pickup continuously. My vision was good at the time and it was not necessary for me to have my car lights on. When I arrived I drove north past the pickup truck and had no difficulty in passing it. It was on the right-hand side or east side of the road. Q. All of it? A. I think so. The road was pretty muddy and I don't think the pickup was at the extreme side of the road, but it was far enough to the side that it was easy to get by it." The doctor was also a witness for plaintiff.

Another witness, George Delperdang, living about seven miles northeast of Remsen, testifying for defendants, said: "My wife and Joe Plathe's mother are first cousins. Tony (Anton) Schiltz and my wife are first cousins. I believe I am on good terms with all of these people. I remember the date of July

29, 1953. In the late afternoon of that date at approximately 7 p.m. I started going south on the (Remsen) cemetery road toward town. When I approached the Schiltz house I observed a car in the ditch. I also observed the pickup truck. It was about a hundred feet south of where the car was at that time. The pickup was due east of the north part of the house. In relation to the sides of the road it was a little bit toward the east. With reference to the side and the middle of the road, I'd say it was a little towards the east of the center of the road on my left-hand side of the road. It was headed north. No one was in it." This witness testified that he heard the testimony of Doctor Christensen (for plaintiff) and of Mr. Junkers, and that the location of the pickup in the road was approximately where they testified it was: "The weather was clear and the sun was shining, and the visibility was good. I approached the Schiltz house from the north and had no trouble driving past the pickup. When I got right beyond the pickup truck * * * Tony Schiltz told me to get a priest and a doctor." Just north of Remsen this witness met Father Ruba driving north and told him where the collision was. He then returned to that place. He further testified: "When I returned I stopped my car considerably south of the pickup truck. It was in the same place where I first observed it. There was nothing deceptive or unusual about the north-and-south road immediately east of the Schiltz home. From the point that the pickup truck was located, looking to the south, it was clear and unobstructed and visible for approximately a quarter of a mile. Q. From that point on would you describe the general topography going south for the next quarter of a mile? A. Well there is a dip in the road there that the pickup would not be visible, of probably a couple of hundred feet. Q. Then does it become visible again after that? A. Yes, there is a hill then going up towards the south. Q. For how far thereafter would the pickup be visible? A. Oh, approximately a quarter of a mile."

Plaintiff's petition, in substance, alleged that defendant Junkers was negligent: in stopping the pickup truck upon the main-traveled road without leaving a clear and unobstructed distance of at least twenty feet opposite said truck for free

passage of other vehicles; in failing to maintain a proper look-out; and in failing to give a proper signal before stopping the truck.

Defendants' answer denied these and all other allegations of the petition, but admitted that Junkers and decedent were operating motor vehicles northward on said highway at the time alleged. Defendants also admitted that at the time of his death decedent was 34 years old with a life expectancy of 36.33 years. There was evidence, uncontradicted, that: his school education ended at the eighth grade, and because of his parents' financial circumstances he quit school to aid them in farming; he never had any serious illness and was in good health when he was killed; he was a quiet, serious man, a hard worker, was getting ahead and was acquiring property and at the time of his death he owned a 1951 stock truck, a portable grinder, John Deere tractor, 900 bushels of corn, 390 bushels of beans, about $400 in trucking accounts, and owed about $2300; the Chevrolet car which he was driving at his death was worth $1200 before it was wrecked, and $150 afterwards; he was happily married and had small children.

Defendants' motions to direct and for judgment notwithstanding the verdict alleged that plaintiff had failed to prove any cause of action as pleaded, or that decedent had taken reasonable precautions for his own safety, or was free from negligence contributing to his injury and death. These motions were denied on all grounds.

At defendants' request the jury was permitted to view the scene of the collision.

Defendants requested, and the court submitted, two special interrogatories to the jury, to wit:

"No. 1. Was Joseph Junkers an eyewitness on July 29, 1953 to all the material movements of the automobile driven by Joseph Plathe from approximately 180 feet south of point of collision with the pickup truck he was driving to a point approximately 30 feet south of the point of impact? Answer 'Yes' or 'No'.

"No. 2. Was the said Joseph Plathe driving on the left-

hand side of the roadway in attempting to pass the pickup truck driven by Joseph Junkers when approaching the crest of the hill at the point of impact between the car he was driving and the pickup truck being driven by Joseph Junkers? Answer 'Yes' or 'No'."

Each interrogatory was answered in the affirmative.

On the jury's verdict of $15,000 in favor of plaintiff, a judgment was rendered and entered in accord therewith.

Defendants' motion "non obstante veredicto" was denied.

I. Errors relied upon for reversal by defendants are:

"1. The court erred in overruling ground three of their motion for a directed verdict, which ground was: 'That there is lacking any evidence upon which a jury could base a finding that plaintiff's decedent was free from any contributory negligence.'

"2. The court erred in submitting the case to the jury under the no-eyewitness rule, in that:

"(a) Plaintiff failed to show that there was no obtainable direct evidence.

"(b) The direct evidence affirmatively shows that plaintiff's decedent was guilty of contributory negligence.

"(c) The physical facts affirmatively show that plaintiff's decedent was guilty of contributory negligence."

Appellants state the issues before this court thus: "The issues of the case were whether the plaintiff's decedent was free from contributory negligence in the accident causing his death; whether or not the court should have permitted the case to go to the jury over defendants' motion for a directed verdict."

The contention of the appellee is: "The sole question presented on this appeal is whether there was sufficient evidence to present a jury question on plaintiff's (decedent's) freedom from contributory negligence."

It is our conclusion that the decisive issues in the case were the contributory negligence of decedent, and whether the determination of that issue was for the jury.

There were no exceptions to the instructions, nor to the failure to give requested instructions. The instructions fairly

stated the applicable law of the case including that pertaining to the no-eyewitness rule, and whether there was an eyewitness. The important issue, and the one before us for determination, is whether the finding and verdict of the jury that the decedent did not negligently contribute to his injury and death was properly sustained by the record.

From this record, as we read it, the jury could properly have found the facts hereinafter stated, in addition to those already noted. The plat (Exhibit "A") shows the gravel portion of the highway was 28 feet wide at the place of collision, and elsewhere so far as pertinent, and that appellant's car was stopped approximately astride the middle line of this portion directly east of the Schiltz house, and about at the crest of the hill. As shown by the plat, the road sloped from its crest south to a point about 300 feet distant where the elevation was approximately ten feet and eight inches lower than at the crest, and might have been the "blind" spot, or low place, testified to by some of the witnesses, where for a distance of about 100 feet there was obstructed vision along the road to the north, so that until decedent reached a point 180 feet south of the place of collision he did not see appellant's truck. And when he saw it at a place where he did not reasonably expect it to be, and was not sure of the clearance for passing it, he was confronted with an emergency which may have disconcerted him, and interfered with his operation of his car. On discovering appellant's truck he immediately proceeded to so operate his car as to avoid a collision by reducing its speed of from 65 to 70 miles an hour and succeeded in reaching a speed of 40 miles an hour. He then attempted to pass to the left of appellant's truck and almost succeeded since the contact between the two vehicles was insufficient to change the position of the truck or to jolt appellant. The testimony of appellant that "if the pickup truck had been 20 feet farther to the north, the car of the decedent possibly could have passed me" was an admission that there was not clearance at the place of impact.

There are several matters that influence this court in its conclusion not to interfere with the verdict of the jury and the judgment. There are numerous conflicts in the testimony. A

number of witnesses had various relationships with the litigants and because thereof may have had an interest in the outcome of the action. The able trial court saw and heard the witnesses, and denied defendants' motions. The jurors observed the witnesses and heard them testify and returned a verdict for the plaintiff. The trial court and jury were better situated than is this court to determine the probative value of the testimony. The jury viewed the surroundings where the collision took place.

We find no errors in the record which justify our disturbance of the judgment.

■ The facts are determinative of this appeal. It would serve no purpose to cite numerous authorities in support of our ruling, as there is no controversy respecting the holdings of this court, that the issue of freedom from contributory negligence is ordinarily for the determination of the jury. Weilbrenner v. Owens, 246 Iowa 580, 68 N.W.2d 293; Leinen v. Boettger, 241 Iowa 910, 926, 44 N.W.2d 73; Pierce v. Dencker, 229 Iowa 479, 484, 294 N.W. 781; Thompson v. Waterloo, C.F.&N.R. Co., 243 Iowa 73, 78, 79, 50 N.W.2d 363; Huffman v. King, 222 Iowa 150, 154, 268 N.W. 144; Fitter v. Iowa Telephone Co., 143 Iowa 689, 693, 121 N.W. 48.

The judgment is—Affirmed.

GARFIELD, HAYS, PETERSON, SMITH, and WENNERSTRUM, JJ., concur.