**Wilbur N. BUMP, Appellant,**

v.

**STEWART, WIMER & BUMP, P.C., D/B/A Stewart, Wimer, Hudson & Flynn, P.C., and James M. Stewart, William Wimer, Roger J. Hudson, and Thomas L. Flynn, Individually, Appellees.**

**No. 68770.**

Supreme Court of Iowa.

July 20, 1983.

R. Richard Bittner, Robert D. Lambert and Vicki L. Seeck of Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, for appellant.

Dwight W. James and William A. Wickett of James & Galligan, P.C., Des Moines, for appellees.

Considered by UHLENHOPP, P.J., and HARRIS, McGIVERIN, LARSON, and SCHULTZ, JJ.

UHLENHOPP, Justice.

This appeal involves problems generated by the separation of a lawyer from a law firm operating as a professional corporation.

James M. Stewart and William Wimer practiced law in Des Moines in 1974 in the firm of Stewart, Wimer, Brennan & Joyce. In late summer of that year the Central National Bank informed Wimer the space the firm occupied in the bank's building would be needed for bank expansion. The firm decided to relocate across the street in the Equitable Building. At about that time, Wilbur N. Bump contacted Wimer; Bump was then practicing law with the firm of Hopkins, Bump & Huebner. Bump was unhappy that his firm had recently elevated several young associates to partners and was interested in possibly joining Wimer's firm. Stewart, whose clients included a number of agricultural cooperatives, was advancing in age and suffering from an illness. Wimer saw Bump's overtures as a possible opportunity to acquire needed assistance for Stewart's clients during Stewart's illness and eventual retirement. After an initial meeting between Wimer and Bump, Wimer and Stewart discussed the possibility of Bump's joining them. The three then met and decided to form a new firm comprised of those three. They also agreed that Roger J. Hudson from the Stewart firm and Thomas L. Flynn from the Hopkins firm would become associates in the new firm.

For tax reasons, Stewart, Wimer, and Bump decided to form a professional corporation instead of a partnership. These three were the sole shareholders, each holding one hundred shares of corporate stock. Both Wimer and Bump informally assured Flynn and Hudson that they would be made shareholders in a year's time.

Stewart and Wimer contributed the physical assets of their old firm to the new professional corporation; Bump was to

make a capital contribution of $5000 over a period of time.

In January 1975 the corporation moved into new offices in the Equitable Building with Bump in charge of coordinating the move. A decorating decision by Mrs. Wimer not to move Stewart's old filing cabinets into the new offices greatly upset Marguerite Brown, Stewart's longtime secretary. To placate Brown the cabinets were eventually moved, but Brown evidently held the incident against Bump and friction developed between the two. Brown began complaining that Bump was taking Stewart's clients and not bringing any income to the firm other than through the agricultural cooperatives. She made up monthly production sheets to support those claims and gave copies to all lawyers in the firm except Bump. In particular, she harassed Wimer with her complaints about Bump, but Wimer ignored the comments by "considering the source." A phone call from Mrs. Stewart with similar concerns, however, prompted Wimer to visit with Bump. Bump agreed to talk with Stewart and to make the relationship between the two more comfortable.

Late in the summer of 1975, the five lawyers had a "bury the hatchet meeting" to air grievances and alleviate growing tensions in the office. The atmosphere seemed to improve for a few months but then began to deteriorate again when Hudson and Flynn broached the subject of shareholder status for themselves. Flynn approached Bump about the topic but was told the two associates should wait until the existing shareholders retired. Flynn, unhappy with this suggestion, relayed the conversation to Hudson who in turn discussed the matter with Wimer. Wimer assured him the problem could be resolved.

In February 1976, a shareholders' meeting was held at which shareholder status for Hudson and Flynn was discussed. A dispute exists as to what was actually decided at that time, but apparently Stewart and Wimer favored issuing fifty shares each to Hudson and Flynn while Bump opposed the idea. At any rate, the firm began to hold Hudson and Flynn out as shareholders after that time.

Soon afterward, a confrontation between Bump and Hudson developed over an expensive daybook Hudson ordered. On another occasion Bump discussed with Hudson the latter's disorganized work habits after Hudson's secretary had complained to Bump. Hudson resented Bump's interference and the two almost reached the stage of fisticuffs. Friction also developed regarding Bump's attempts to act, at the corporation's direction, as office manager—duties formerly performed by secretarial staff.

A short time later Wimer, Hudson, and Flynn attended an informal gathering with some of their wives at the home of William C. Knapp II, a law clerk at the firm. In the course of the evening, Hudson and Flynn expressed their desire to cease the practice of law with Bump; the two feared for their position with the firm should anything happen to Stewart and Wimer and intimated they were looking for other office space. Wimer was surprised by these statements and, after visiting with his wife about it, brought the problem to Stewart's attention. Stewart and Wimer decided the best solution for all concerned would be for Bump to leave the firm. Wimer so informed Bump by handwritten message on September 8, 1976. Stewart also wrote Bump a letter on October 1, 1976, telling him his position with the firm was terminated as of September 30, 1976.

The remaining members of the firm were willing to compensate Bump for his shares in the corporation and made the corporate books and records available to him for valuation purposes. Bump's accountant presented a figure to the corporation that included a substantial sum for goodwill beyond the amount the others felt appropriate. The others did not hire an accountant themselves, thinking that course would be futile in light of Bump's demand for $272,053. At the annual shareholders' meeting on November 5, 1976, Bump was not re-elected to the board of directors. He remained in the firm's offices until May 1977,

however, and has not yet been paid for his shares.

Bump commenced this suit in equity in January 1980. He alleged that Hudson and Flynn never actually became shareholders and that he was therefore entitled to one-third rather than one-fourth of the corporation's value. He also maintained that the value of the corporation included goodwill. In addition, he sought damages for breach of an alleged employment contract with the corporation, for tortious interference with his contract, and for conspiracy by Stewart, Wimer, Hudson, and Flynn to terminate his relationship with the corporation. The corporation counterclaimed for office expenses attributable to Bump for the period after he was asked to leave and before he did so.

The trial court found Hudson and Flynn were in fact shareholders so that Bump was entitled to one-fourth of the corporation's value, refused to include an amount for goodwill, and denied Bump's damage claims. The court also allowed the corporation to offset Bump's expenses from the total owed him, and found the amount due Bump to be $13,609.31 plus interest.

Bump appealed, claiming error in the finding he is entitled to only one-fourth of the corporation's value, in the refusal to include goodwill in the corporation's valuation, and in the denial of his damage claims.

Our review is de novo. Iowa R.App.P. 4. We give weight to the findings of the trial court but are not bound by them. Iowa R.App.P. 14(f)(7); *Citizens Savings Bank v. Sac City State Bank,* 315 N.W.2d 20, 24 (Iowa 1982).

I. *Shareholder status of Hudson and Flynn.* Bump claims neither Hudson nor Flynn were shareholders as of the date he was separated from the corporation. If correct, Bump would be entitled to compensation for one-third of the corporation's value as of that date because he held one hundred shares out of a total three hundred. If, however, Hudson and Flynn were shareholders on that date, Bump would be entitled to only one-fourth the corporation's value, one hundred shares out of four hundred.

Bump argues the corporation's shareholders never unanimously agreed to issue shares to Hudson and Flynn nor did they collectively decide on a consideration for any shares issued. He points to section 496C.10 of the Iowa Code, which provides in part:

Unless otherwise provided in the articles of incorporation or bylaws, the affirmative vote or consent in writing of all of the outstanding shareholders entitled to vote, or such lesser proportion as may be provided in the articles or bylaws, is necessary in order to authorize the issuance of any shares . . . and to fix the consideration for shares. . . .

. . . .

Though no corporate minutes exist on the subject, the testimony shows Wimer moved at a February 1976 shareholders' meeting that Hudson and Flynn each be issued fifty shares of corporate stock at seventy dollars a share. Stewart and Wimer voted in favor of this motion while Bump, although present, did not vote.

Bump contends this lack of unanimity is fatal. But under section 496C.10, corporate bylaws may dispense with the unanimity requirement in favor of a lesser standard. Article IV, section 1 of the corporation's bylaws states: "New shareholders may purchase stock only upon the *majority* vote of all the then shareholders." In addition, Article I, section 5 states in part that "*all matters* coming before any meeting of the shareholders shall be decided by the vote of a *majority* of the shareholders entitled to vote. . . ." (Emphasis added.) We hold that the corporation, through the vote of two hundred out of three hundred issued shares, properly determined to issue stock to Hudson and Flynn and set the consideration for those shares.

Bump next claims that formalities were overlooked in making Hudson and Flynn shareholders. The consideration for the stock was not paid until September 1976, and the corporate name was not legally changed with the secretary of state until January 1977. The record shows, however,

that the corporation held itself out at the time as having two new shareholders. The firm letterhead was changed to include the two new names; the receptionist began answering the telephone as "Stewart, Wimer, Bump, Hudson, and Flynn"; the names of Hudson and Flynn were added to the corporation's title on the office door; Martindale-Hubbell was notified of the corporate change; new signatures were authorized for the corporation's bank accounts; and Bump's secretary, who prepared shareholder memoranda, began distributing them to Hudson and Flynn. Bump acquiesced in these changes and did not raise the issue of formalities until his ouster.

Equity regards substance over form and disregards technicalities to prevent injustice. *Beck v. Trovato,* 260 Iowa 693, 697, 150 N.W.2d 657, 659 (1967); *Fischer v. Klink,* 234 Iowa 884, 893, 14 N.W.2d 695, 700 (1944); 30 C.J.S. *Equity* § 107, at 1083 ("By force of its principle equity goes behind the form of a transaction in order to give effect to the intention of the parties...."). Looking beyond form in this case, we think Hudson and Flynn were shareholders in the corporation as of the time of Bump's ouster. Bump's holdings in the corporation, therefore, were one-fourth; he held one hundred shares out of four hundred.

II. *Law firm goodwill.* Bump finds error in the trial court's refusal to include an amount for goodwill in the corporation's value. The parties agree the corporation should be valued according to section 496C.14 of the Iowa Code. That section provides the purchase price of shares shall be book value adjusted for work in process and accounts receivable; goodwill is not mentioned. An accountant who testified for Bump at trial acknowledged that he had never valued goodwill of a law firm but stated that the goodwill of an accounting firm would be based on gross billings in the year preceding a member's withdrawal. The trial court found Bump took a substantial number of clients with him when he left the corporation, clients who represented over forty percent of annual gross billings. The court concluded that Bump therefore

took more than his one-fourth share of firm goodwill and is not entitled to more.

Without deciding that point, we rest the decision denying inclusion of goodwill in the corporation's value on ethical considerations also discussed by the trial court. "Goodwill" may be defined as "the ability of a particular law firm to attract clients either because of the firm's name, the firm's physical location, or the concomitant reputation of the lawyers employed by the firm." Annot., 79 ALR 3d 1243, 1244 (1977). Few courts have faced this precise issue, but those that have encountered it have held the goodwill of a law practice is not an asset which may be sold or transferred for consideration.

An illustrative decision is *Lyons v. Lyons,* 246 Cal.App.2d 519, 54 Cal.Rptr. 829 (1966). The plaintiff was ousted from a ten-member law firm. An accounting of his one-tenth share did not include anything for goodwill. On his objection the court pointed out that the goodwill of the law partnership was nothing more than an aggregate of the goodwill of each individual attorney, and stated:

> The nature of a professional partnership for the practice of law, the reputation of which depends on the skill, training and experience of each individual member, and the personal and confidential relationship existing between each such member and the client, places such a partnership in a class apart from other business and professional partnerships. The legal profession stands in a peculiar relation to the public and the relationship existing between the members of the profession and those who seek its services cannot be likened to the relationship of a merchant to his customer.

*Id.* at 524, 54 Cal.Rptr. at 831. Other courts have recognized that the attempted purchase of a law firm's goodwill includes the expectation of future patronage from former and current clients, but the attorney-client relationship is personal and confidential. Clients cannot be forced to accept the services of a particular attorney. *Geffen v.*

*Moss,* 53 Cal.App.3d 215, 226, 125 Cal.Rptr. 687, 692 (1975). *See Dwyer v. Jung,* 133 N.J.Super. 343, 347, 336 A.2d 498, 499, *aff'd,* 137 N.J.Super. 135, 348 A.2d 208 (1975) ("A lawyer's clients are neither chattels nor merchandise, and his practice and good will may not be offered for sale."); *Koehler v. Wales,* 16 Wash.App. 304, 311, 556 P.2d 233, 238 (1976) (placing a "price tag on the good-will of a law practice" is contrary to public policy). *See also Detroit Bank & Trust Co. v. Coopes,* 93 Mich.App. 459, 287 N.W.2d 266 (1980); Iowa Code of Professional Responsibility DR 2–103(B).

█ Though instances may exist in which goodwill of a law practice may properly be valued, *see e.g., Todd v. Todd,* 272 Cal.App.2d 786, 78 Cal.Rptr. 131 (1969); *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1 (1983); and *Levy v. Levy,* 164 N.J.Super. 542, 397 A.2d 374 (1978) (all involving property settlements in divorce), the transfer or withdrawal of a portion of a law practice, such as we have here, is not such a situation. The trial court in this case properly disregarded goodwill.

We do not consider other valuations of corporation assets made by the trial court, as no error as to those has been assigned.

III. *Damage claims.* We group Bump's damage claims into three general categories: (1) tortious interference with his employment contract, (2) conspiracy among the other members of the firm to deprive him of his employment, directorship, and shareholder status in the corporation, and (3) breach of the fiduciary duties of Stewart and Wimer to the corporation by allowing Bump's ouster.

█ A. As to tortious interference with an employment contract, Bump testified he had no written employment agreement with the corporation and could not explicitly say an oral agreement existed. Other members of the corporation testified no written or oral agreements existed among the lawyers in the firm. The record contains some indication that employment contracts had been drafted, but no evidence appears that they were ever executed. Absent a contract a valid claim of tortious interference with a contract cannot exist. *Restatement (Second) of Torts,* § 766 comment *a,* at 8 (1977).

█ Even if the existence of a contract were assumed, Bump presented no evidence of damage. On the contrary, his income for the calendar year following his separation from the corporation more than doubled. No claim lies for relief predicated on the tort of contractual interference if damage is not generated. *Stoller Fisheries, Inc. v. American Title Insurance Co.,* 258 N.W.2d 336, 341 (Iowa 1977).

█ Independent of those considerations, the individual members of the firm would have been justified in terminating an employment contract between Bump and the corporation. Stewart, Wimer, Hudson, and Flynn had an interest in preserving the established law practice. They came to view their relationship with Bump as detrimental to their practice. No evidence indicates wrongful means were employed in separating Bump from the group. In the separation of Bump from the firm, all parties acted openly and honestly. *See Geib v. Alan Wood Steel Co.,* 419 F.Supp. 1205, 1209 (E.D.Pa.1976). We do not find a tortious interference with a contract.

█ B. Bump alleges the four remaining members of the corporation conspired to deprive him of his employment, directorship, and shareholder interest. He especially points to Hudson and Flynn. The principal element of conspiracy is an agreement or understanding between two or more persons to effect a wrong against another. Conspiracy involves some mutual action coupled with an intent to commit the act which results in injury. *Basic Chemicals, Inc. v. Benson,* 251 N.W.2d 220, 233 (Iowa 1977). The burden of proof is on the plaintiff to prove misconduct; suspicion is not enough. *See Charles v. Epperson & Co.,* 258 Iowa 409, 414, 137 N.W.2d 605, 608 (1965).

█ Bump can point to no specific instance in which any of the four defendants wrongfully plotted or schemed for his re-

moval. On the contrary, Hudson and Flynn were considering *their* withdrawal from the firm, not attempting to remove Bump. Wimer went to Stewart as soon as he was aware of the depth of the problem. A decision was quickly made and soon relayed to Bump that the best solution for all concerned was for him to leave. We find Bump failed to meet his burden of proof of conspiracy to commit a wrong.

C. In alleging Stewart and Wimer breached fiduciary duties, both as directors and majority shareholders, Bump points to their denying him his employment, directorship, and shareholder status with the corporation. We fully recognize the fiduciary duties of corporate officers and directors in dealing with their corporation and its shareholders. *Linge v. Ralston Purina Co.,* 293 N.W.2d 191, 193 (Iowa 1980).

Once again, however, we find that Stewart and Wimer took the course they thought best for the corporation and all individuals involved. We agree with the North Carolina Supreme Court in the following passage from a case alleging wrongful contractual interference by corporate directors:

> As stockholders they had a financial interest in the corporation; as directors they owed it fidelity and the duty to use due care in the management of its business. . . . As either directors or stockholders, they were privileged purposely to cause the corporation not to renew plaintiff's contract as president if, in securing this action, they did not employ any improper means *and if they acted in good faith to protect the interests of the corporation.* In other words, because of their financial interest and fiduciary relationship they had a qualified privilege to interfere with contractual relations. . . . To hold otherwise, "would tend to hinder directors of a corporation from acting on their judgment for the interest of their corporation. . . ."

*Wilson v. McClenny,* 262 N.C. 121, 132–33, 136 S.E.2d 569, 578 (1964) (emphasis added) (quoting 3 W. Fletcher, *Private Corpora-*

tions § 1001, at 541 (1975)). Stewart and Wimer did not violate fiduciary duties.

We thus hold that Bump is entitled to $13,609.31, plus statutory interest at six percent per annum from the valuation date until the commencement of this action and at ten percent per annum from the commencement of this action until paid. *See* Iowa Code §§ 496C.14(3), 535.3 (1981).

AFFIRMED.