ROBERT G. THOMPSON, appellant, cross-appellee, v. DON L. MILLER and JAMES H. MCFARLAND, appellees, cross-appellants.

## No. 49870.

(Reported in 100 N.W.2d 410)

Gibson, Stewart & Garrett, of Des Moines, for appellant.

Alex M. Miller, of Des Moines, for appellees.

GARRETT, J.—This is an action to recover damages for breach of contract relating to the manufacture and sale of two simple unpatented articles known as hitch pins and lynch pins. The plaintiff, Robert G. Thompson, primarily a salesman, having learned of the need and possible market for a pin or device for use in connecting certain farm implements, induced the defendant Don L. Miller to enter into a written agreement, later verbally modified, pursuant to which the pins were manufactured by Miller and sold by Thompson over a period of years.

The original contract was embodied in Exhibit "A", a letter from Miller to Thompson, as follows:

"We agree to manufacture these pins in sizes necessary for the market at cost-plus 10% profit for the Miller Products Company Manufacturing Department. Now, when these pins are sold they will be considered as an item sold by Don Miller's Selling Department and Bob Thompson is to receive ½ of the money taken in from the sale of the pins after the Miller Products Company have been paid for manufacturing them.

"It is understood this agreement applies to every hitch pin made by Miller Products Company, regardless of how, or who it is sold to."

To the above letter the plaintiff replied: "Many thanks for sending me the working agreement on the hitch pin. I think it is very fair indeed and I believe we will sell lots of the pins."

Because of accounting problems the above agreement was later verbally modified to provide for payment on a commission basis of five cents or more per pin depending on size. Miller in his answer alleged:

"That during the years said defendants manufactured hitch pins the basis of paying commissions to plaintiff was altered and reduced to the following written terms: 'Mr. Thompson gets .05¢ each as a commission on all hitch pins which are sold and delivered and collected for by the Miller Products Co. There are also some specific numbers in the setup which he receives 10¢ commission and on the large tractor type hitch pin, he receives more than 10¢. * * * We assume no responsibility in connection with selling hitch pins. All advertising shall be equally divided between the Miller Products Company and Mr. Thompson.' "

In 1956 Miller sold the entire business, plant and equipment to defendant James H. McFarland who refused to recognize any obligation to plaintiff or to enter into any contract satisfactory to him. The latter, thus being without employment or income from the hitch pin or lynch pin business he had built up, brought suit against both defendants for damages.

Trial resulted in a jury verdict against each defendant for $12,500. Motions for directed verdict and for judgment notwithstanding verdict were overruled and motions for a new trial were sustained. All parties appealed from the rulings adverse to them.

I. It is Thompson's contention that by the terms of his contract with Miller he was permanently employed and therefore entitled to a commission on every hitch pin and lynch pin sold by Miller or Miller Products Company, under which name Miller operated, or by McFarland since he purchased the business.

It is undisputed plaintiff was paid in full to date of the sale, June 20, 1956. Miller claims the sale of the business terminated his contract with plaintiff. It is unquestioned that over the 10-year period of plaintiff's employment he built up a substantial hitch pin business with jobbers who continued to send in orders after McFarland took over, and presumably additional sales will

result from the business built up by plaintiff who claims his employment was coupled with an interest since he not only paid his own expenses while traveling and making sales but paid half of the advertising and other sales expense.

The question is then: does the contract involved provide permanent or lifetime employment to plaintiff and is it binding on McFarland as purchaser of the business? What did the parties intend when the contract was entered into? Was a lifetime contract then within the contemplation of the parties?

" 'A contract for life will be upheld only where the intention, that the contract's duration is for life, is clearly expressed in unequivocal terms.' " Lewis v. Minnesota Mutual Life Ins. Co., 240 Iowa 1249, 1257, 37 N.W.2d 316, 321; Paisley v. Lucas, 346 Mo. 827, 842, 843, 143 S.W.2d 262, 270, 271.

In the instant case the words "lifetime" and "for life" were not claimed to have been used but the contract does provide that it applies "to every hitch pin made by Miller Products Company, regardless of how, or who it is sold to", and Miller testified the agreement to pay on a commission basis was permanent and that the contract would follow the business. In this case more is involved than mere services. Plaintiff paid half of the advertising and sales costs and all of his traveling expenses. He thus had a capital as well as a labor investment.

The evidence discloses, however, that for a considerable time before McFarland took over the business, Thompson was very inactive, doing nothing to stimulate the business and making no sales. Miller expressed displeasure at that situation in a letter to Thompson in these words:

"In reviewing the activity of hitch pins over the past 2½ years I find a very discouraging situation. * * * In fact you have done practically nothing to stimulate or create any new business spending the winters in Florida and a good deal of the balance of the time at Clear Lake. Progressively your activity has become less and less until this year when you have practically ceased all operation toward selling. Because we started out to help you sell hitch pins several years ago does not mean that we are obligated to continue with you on a commission basis forever."

It is reasonable to infer that such disinterest on Thompson's part was not in Miller's mind when the terms of the contract were agreed upon.

On the other hand, the hitch pin enterprise was new. It was plaintiff's idea and uncertain as to its future. The parties may have considered it in the nature of a joint adventure into which plaintiff was putting cash as well as his services. The original plan was to divide the profits. Plaintiff testified that in 1953 "I asked Mr. Miller * * * if he remembered our original contract on the 10% cost plus, whether the acceptance I gave him at that time on the five cents a pin, in his mind became a permanent arrangement. In mine it hadn't. He said yes, that was to be permanent. I said, 'That is fine, that answers question number one.' And that became a permanent arrangement in my mind as it had been in his ever since 1945."

It appears plaintiff was not too sure of his contractual arrangement in 1953. He testified: "I said, 'Don, in case you want to retire or begin to think about getting rid of this business sometime, what happens to Bob Thompson and his contract?' He said, 'Your contract will go along with whoever succeeds me in this business.' " On cross-examination he said, "I was working and selling Miller products in 1945. I called myself a self-employed salesman. I was selling other products besides hitch pins at that time. I had commenced selling hitch pins for myself in 1943. My contract with Mr. Miller was confined to hitch pins. There was nothing in the contract to demand that I devote 100% of my time to hitch pins. There was nothing in the contract as to how much I should sell or to whom or how much time I spent selling them. I considered that I was my own boss in deciding sales and sales policy. I sold enough to keep ahead of Mr. Miller."

Miller testified: "Bob Thompson asked me what would happen to him if I sold out the business and that testimony has already been given that I told him that I would try and arrange for him to make a deal with the new buyer; that I couldn't do anything for him after I sold the business." Regarding a later conversation he testified: "I said to Bob, 'I have sold the business. I told you a long time ago that I was going to sell the

business and I asked you to make an arrangement with Jim Mc-Farland. I have talked with Jim McFarland and he says that he could make an arrangement and would make an arrangement with you, provided it was on a business basis and not on a featherbed basis, and if you haven't made an arrangement with Jim, you should have.' "

It is clear from the evidence we have set out that the parties placed different constructions upon their contract and the evidence is such as to generate a jury question as to what the parties intended when they entered into and modified the contract involved herein. Definitely the court cannot say as a matter of law what this partly written and partly oral contract was or how the parties understood or intended it.

II. Defendant Miller insists plaintiff's petition does not state a cause of action, particularly in that it contains no allegation that the contract was permanent or for the life of plaintiff. The petition was amended to conform to the proof by adding the allegation "that the contract, Exhibit 'A', was so modified, interpreted, carried into effect and acted upon by the parties so that the same was a permanent, noncancellable contract." The petition was not vulnerable to that attack, and there was evidence to support its material allegations.

We must consider the evidence in the light most favorable to plaintiff. Moyers v. Sears-Roebuck & Co., 242 Iowa 1038, 48 N.W.2d 881; Wiese v. Hoffman, 249 Iowa 416, 86 N.W.2d 861; Pappas v. Evans, 242 Iowa 804, 48 N.W.2d 298; Leinen v. Boettger, 241 Iowa 910, 44 N.W.2d 73; Primus v. Bellevue Apartments, 241 Iowa 1055, 44 N.W.2d 347, 25 A. L. R.2d 565.

We hold therefore on the record that the motion of defendant Miller for judgment notwithstanding the verdict on the grounds urged was properly overruled.

III. The court sustained the defendant Miller's motion for a new trial on several grounds. Where the trial court grants a new trial, if any ground of the motion therefor was well founded, the grant of a new trial was required. "Consideration of the other grounds which the court upheld is not necessary, unless the same question might reasonably be expected to arise upon another trial." Klein v. Swift & Co., 248 Iowa 563, 569,

330

81 N.W.2d 469, 473; Jordan v. Schantz, 220 Iowa 1251, 264 N.W.259; Hydinger v. Chicago, B. & Q. Ry. Co., 126 Iowa 222, 101 N.W. 746.

The discretion of the trial court to order a new trial is greater than that of the appellate court. Lewellen v. Haynes, 215 Iowa 132, 244 N.W. 701.

The trial court has wide discretion in granting a new trial in a jury case, and an order granting a new trial will not be disturbed except where it clearly appears that there has been an abuse of discretion. Jordan v. Schantz, supra; Gregory v. Suhr, 221 Iowa 1283, 268 N.W. 14.

The court sustained the motion for a new trial on the ground, among others, that the verdict of $12,500 against each defendant was excessive and the result of passion and prejudice. On the record before us, we are of the opinion there was no abuse of discretion here and the order granting defendant Miller a new trial is affirmed. The other grounds of defendant Miller's motion for a new trial were not sufficient except in so far as they challenge the failure of the court to state Miller's defenses as something more than a general denial. Prejudice may have resulted to defendant from the failure of the court to state the affirmative defenses with the same particularity applied to the statement of plaintiff's case. Having failed to do so and acting within its proper discretion, the court named this as one of the grounds upon which it ordered a new trial.

We believe the court was right in holding there was ample evidence in the record to sustain the motions for a new trial on the ground the verdicts were excessive. For some years plaintiff traveled and personally sold to jobbers with results satisfactory to all parties. For a considerable time, however, he had been off the road and this resulted in a falling off of business which made Miller very unhappy. The hitch pin was not a patented article. There could be no assurance of any substantial volume of business in the future. There would seem to be a considerable amount of speculation and conjecture as to future earnings with plaintiff no longer carrying his end of the contract. On March 10, 1953, Miller wrote the plaintiff, "If you are not satisfied with your present status and arrangements with the Miller Products Company, we believe it would be mutually advantageous for you

to take your customer list and knowledge of selling to some other company and carry on as you see fit." It was always within plaintiff's rights to take his hitch pin, or the greatly improved one which Miller had devised, and go to another manufacturer, thus keeping the defendants from any substantial profit from that line. Granting a new trial was clearly not an abuse of discretion.

IV. While what we have said above relates principally to the suit against Miller, it applies also to a considerable extent to the action against McFarland, who, for many years prior to buying Miller's business, had worked for Miller and was familiar with all facets of the enterprise.

The trial court granted McFarland a new trial on seven of the grounds contained in his motion. They relate to two requested instructions and to the claimed lack of any evidence that plaintiff and McFarland ever had any dealings whatever regarding hitch pins. The requested instructions if given would have amounted to a directed verdict for McFarland, and on the record should not have been given. There was evidence McFarland knew or should have known the details of plaintiff's agreement with Miller and the claim that it was a permanent or lifelong contract relating to "every hitch pin made by Miller Products Company, regardless of how, or who it is sold to."

It is undisputed that McFarland at the time of the trial was still receiving repeat orders and reorders as a result of plaintiff's previous activities under the contract.

While there may be some doubt about the other grounds of McFarland's motion, there can be no doubt the trial court was right in sustaining it on the ground the verdict was excessive. It is clear McFarland entered into no agreement with plaintiff. He purchased the assets of the business known as Miller Products Company under the agreement that the seller assumed all liability incurred by past agreements, verbal or written, growing out of the operation of the business prior to July 1, 1956. Any question of the liability to protect or indemnify McFarland was, by stipulation, taken out of the case submitted to the jury.

McFarland's liability, if any, grows out of his having taken over the property, business, obligations and accounts of Miller

subject, so far as plaintiff is concerned, to any rights he has therein.

The order of court overruling defendant McFarland's motion for judgment notwithstanding the verdict and granting a new trial is affirmed.—Affirmed.

All JUSTICES concur.