Henry L. WOLFE, Appellee,

v.

John M. GRAETHER and Wolfe Clinic,
P.C., Appellants.

No. 85–03.

Supreme Court of Iowa.

June 18, 1986.

As Amended on Denial of Rehearing
July 18, 1986.

H. Richard Smith, Robert G. Allbee and David Swinton of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, for appellant John M. Graether.

John C. Cortesio, Jr., Michael Figenshaw, Denny M. Dennis and David L. Jenkins of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellant Wolfe Clinic, P.C.

Ross H. Sidney and Mark J. Wiedenfeld of Grefe & Sidney, Des Moines, for appellee.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, CARTER and WOLLE, JJ.

CARTER, Justice.

Defendant, Wolfe Clinic, P.C. (the clinic), appeals from a judgment awarding damages in an action brought against it by plaintiff, Henry L. Wolfe, alleging that the clinic breached its contract of employment with him. Defendant, John M. Graether, M.D. (Dr. Graether), appeals from a judgment against him in the same action for actual and punitive damages on a claim that he tortiously induced a breach of plaintiff's employment contract by the clinic.

The clinic is a professional corporation, and Dr. Graether is a shareholder and director thereof. Both defendants contend that the district court erred in not directing a verdict against the plaintiff on all of his claims, or, in the alternative, erred in rulings on evidence and in instructing the jury on certain issues. Both defendants also assert that the amount of damages awarded by the jury is excessive. We consider the separate claims of the parties and reverse the judgment against both defendants.

Plaintiff's father, Otis R. Wolfe, was a medical doctor and surgeon who began practicing his profession in Marshalltown, Iowa, in 1919. He had been a licensed

optometrist in Kansas and had practiced as such prior to obtaining his medical degree. In his medical practice he specialized in treatment of the eyes, including surgical removal of cataracts. Two of Otis R. Wolfe's sons, Otis D. and Russell, were medical doctors with specialized training in opthalmology. They joined their father in the practice of medicine in Marshalltown shortly before the outbreak of World War II and, except for military service during that war, continued to practice in Marshalltown into the 1970s.

The plaintiff is a licensed optometrist who entered into a professional association with his father and brothers around 1941. He performed refracting services in the testing of vision and prescribing of eyeglasses and also assisted his father and brothers in the scheduling and management of their medical and surgical patients. He acted as the de facto business manager for other family members with respect to both professional and investment activities. Both plaintiff and his father frequently appeared before groups of optometrists lecturing to them concerning the proper identification and treatment of cataracts. Such activities, the record reflects, resulted in a high number of surgical referrals by optometrists to Otis R. Wolfe, Otis D. Wolfe, and Russell Wolfe.

By the mid–1950s, Dr. Otis R. Wolfe had ceased to practice medicine. The Wolfe Eye Clinic was operating as a partnership with Otis D., Russell, and the plaintiff being the partners. The clinic provided traditional professional eye care, with special emphasis placed upon the surgical removal of cataracts by Otis D. and Russell. Plaintiff and salaried optometrists performed refracting services with respect to the prescription of standard eyeglasses. Plaintiff continued to act as clinic business manager. Sometime in the late 1940s, the brothers had formed another partnership, "Wolfe Brothers," to pursue investment opportunities. Plaintiff was virtually the exclusive manager of such activities.

In 1958, the partnership hired Dr. Russell Watt, an opthalmologist, as a salaried employee. Watt was made a partner with the Wolfe brothers in 1962. Dr. Graether, an opthalmologist, joined the clinic as a salaried employee in 1962 and became a partner in 1965. Dr. Russell Widner, an opthalmologist, joined the clinic as a salaried employee in 1968. Widner was to be made a partner effective January 1, 1970. The proposed partnership agreement designed to implement that status was never executed, however, because a decision was made to convert the partnership into a professional corporation. Between 1970 and the time of trial in 1984, two additional opthalmologists and one otolaryngologist joined the medical staff of the clinic and became shareholders and directors in the professional corporation. Surgery was the principal income-producing activity of the clinic.

Effective July 1, 1970, the clinic became Wolfe Eye Clinic, P.C. Prior to its incorporation, legal counsel advised the members of the partnership and Widner that, because one of the partners, the plaintiff, was an optometrist and the others were all medical doctors, plaintiff would not be eligible for shareholder status if the clinic was converted to a professional corporation. In the present action against the clinic, plaintiff has contended that, when this information became known, he was assured by the other partners and Dr. Widner that he would be given a permanent employment status with the professional corporation commensurate in responsibility and remuneration with that which he had experienced during the existence of the partnership. In 1969, plaintiff was being compensated equally with Otis D., Russell, Watt, and Graether.

At the trial, plaintiff presented evidence that his father, Otis R. Wolfe, had exacted an agreement from Otis D. and Russell in the late 1940s that, in their professional association, the plaintiff would be compensated equally with them. This was corroborated by the testimony of Otis D. Wolfe. He stated that he was not happy with that arrangement and believed it resulted in plaintiff being overcompensated, but

agreed to it in order to satisfy his father. Plaintiff testified that, when it was determined that he could not become a shareholder and director of the professional corporation, "[t]hey [the other partners] assured me that I would have all of the rights that I had had as a partner." He was then asked:

Q. Having been given that promise, did you then agree to let them go ahead and incorporate? A. Yes, sir.

Plaintiff testified that he interpreted this assurance to be that he would enjoy permanent employment with the newly-formed professional corporation. Russell Wolfe testified that he agreed with plaintiff's interpretation of the transaction. In their testimony, Otis D. Wolfe, Watt, Graether, and Widner do not agree that this was the intention of the arrangements made at that time.

After incorporation, plaintiff functioned as business manager and public relations director of the clinic. He performed a substantially reduced amount of refraction in testing for eyeglasses and played an increasing role in the scheduling of patients. There is a dispute in the evidence presented at trial concerning whether the plaintiff at the time of incorporation consented to a schedule of compensation which would provide him with an amount equal to seventy-five percent of the amount paid to a surgeon working full time. With the possible exception of Russell Wolfe, the other partners and Widner, all of whom were surgeons, testified that the plaintiff agreed that after incorporation his compensation would be 95 percent of a surgeon's share in 1970, 90 percent in 1971, 85 percent in 1972, 80 percent in 1973, and 75 percent in 1974. A similar compensation schedule for plaintiff had been included in the unexecuted 1969 partnership agreement that had been proposed in order to add Widner as a partner. The plaintiff maintains that he only agreed to a one-time reduction from the full share he had been receiving as a partner to ninety-five percent of a full share.

Plaintiff was compensated for his first year as an employee of the professional corporation at the rate of ninety-five percent of the amount which was received by the surgeons. By fiscal year 1973–74, his share had been reduced to eighty-five percent. This was in part attributable to a newly-adopted compensation formula applicable to both the surgeons and plaintiff which, to some extent, made compensation dependent upon the type of work being performed. Under this formula, plaintiff's compensation would become seventy-five percent of the amount paid to the surgeons effective July 1, 1974. By July 1, 1978, this formula would have reduced his compensation to sixty percent of that paid to a surgeon working full time.

When plaintiff balked at a proposed reduction of salary below seventy-five percent of the amount paid a surgeon working full time, the board of directors of the clinic, dealing through Dr. Widner, attempted to negotiate a compromise providing for payment of plaintiff's salary at a rate of sixty-five percent of what the surgeons received until he attained age sixty-five, at which time plaintiff would be expected to retire. Plaintiff attained age sixty-five in 1982. There is a dispute in the evidence concerning whether plaintiff ever accepted this proposal. Widner testified that plaintiff agreed to this arrangement in June of 1978, and that he (Widner) so informed the board of directors. Plaintiff testified that he never accepted the proposal and never agreed to retirement at age sixty-five.

During the time that he was employed by the professional corporation, plaintiff had two written employment agreements. The first of these agreements was dated July 1, 1970. The preamble of that agreement recited that the former partnership had recently been dissolved, that plaintiff had been a partner in that partnership, and that the newly-formed corporation wished to assure itself of the continued services of the plaintiff upon terms and conditions set forth in the employment agreement. With respect to compensation, section 2 of the agreement provided:

[T]he Employee shall receive as compensation for services to be rendered to the Corporation a salary and bonus as shall be determined by the Board of Directors in June of each year for the next succeeding fiscal year and in addition such year-end discretionary bonus as the Board of Directors shall declare.

It was also provided in section 3 of this written employment contract that:

The term of this Agreement shall be from the date hereof to the date of death of the Employee, or his retirement, or permanent disability. Involuntary retirement shall be determined by the unanimous vote of all of the other shareholders of the Corporation.

A new contract of employment was executed between the plaintiff and the clinic on July 1, 1973. It did not differ materially from the July 1, 1970 agreement except that the recitals in the preamble concerning the dissolution of the partnership were deleted and replaced by a recital which provided:

[A]n Employment Agreement has heretofore been in existence between corporation and Employee; and, ... additional agreements are now being contemplated and, ... it is now the desire of the parties hereto to incorporate the original Employment Agreement, together with all amendments, into one new Employment Agreement.

In addition to this change in the recitals, a new section 12 was added to the agreement which provided:

It is further agreed that while this contract of employment is a contract of employment for a period of specified time, that in the event either party hereto shall find the employment situation intolerable, the employment relationship may be terminated by either party, upon giving a one hundred twenty day notice of intention to terminate employment, in which event the employment situation and the relationship of employee-employer shall terminate at the end of said one hundred twenty day period.

In the fall of 1979, several disputes arose between the plaintiff and the clinic board of directors concerning his activities as business manager of the clinic. During some of the discussions of the board of directors concerning these matters, Dr. Graether reaffirmed the view which he had expressed to the board on earlier occasions, that plaintiff was substantially overcompensated. The genesis of that position on Graether's part apparently antedated the forming of the professional corporation, as he had expressed the same views during the existence of the partnership arrangement. Graether's criticism relating to excess compensation also extended to Otis D. and Russell. There was testimony at the trial that Dr. Graether, on occasion, threatened to terminate his professional association with the clinic if plaintiff's status and compensation were not substantially altered.

On October 15, 1979, the board met with legal counsel and reviewed plaintiff's employment contract. The issue of either terminating plaintiff's employment or assigning him new responsibilities at a reduced rate of compensation was considered. The minutes of that meeting and a subsequent meeting held on October 29, 1979, indicate that the clinic's directors were advised by legal counsel that he believed that plaintiff's employment contract was indefinite in duration and therefore terminable at the will of either party. Counsel further advised that, in any event, plaintiff's employment was subject to termination by involuntary retirement under section 3 of his written employment contract or as a result of a finding of intolerability under section 12 of that agreement.

The minutes of the October 15 meeting of the clinic's board of directors indicated that the board was reluctant to terminate plaintiff's employment without first offering an alternative employment arrangement. Legal counsel advised the board, however, that its position would be stronger if the existing employment relationship were terminated in its entirety prior to negotiating a different arrangement. Notwithstanding this advice, the board con-

cluded that Dr. Watt should work with legal counsel in an effort to negotiate some other employment arrangement with the plaintiff. At the October 29 meeting of the board, resolutions were unanimously adopted establishing that plaintiff's existing employment situation "is intolerable," but further providing that "nothing contained in the preceding resolution shall preclude the establishment of a new and different employment relationship between [plaintiff] and [the clinic]."

When efforts to negotiate a different employment relationship involving reassignment of duties and reduction in compensation were deemed unacceptable by plaintiff, the board, by resolution unanimously adopted on February 4, 1980, reaffirmed its determination that plaintiff's employment situation was intolerable, determined that plaintiff should be involuntarily retired, and further determined that, to the extent his employment was indefinite in duration, it should be terminated 125 days after service of notice of termination upon him. Russell Wolfe had retired and was no longer on the board when these resolutions were adopted. Otis D. Wolfe testified that he voted in favor of the resolutions as a result of Graether's threats to leave, and because he believed plaintiff would be reemployed with a different job description and reduced salary.

Notice in accordance with this resolution was served upon plaintiff 125 days prior to June 30, 1980, and payment of compensation to plaintiff terminated as of that date. At the conclusion of his employment, plaintiff was paid the following entitlements in accordance with the provisions of his contract applicable to retiring employees: pension and profit sharing plan values, his entitlement to a share of accounts receivable and retained earnings, the value of his stock in the corporation which owned the clinic's buildings and equipment, his final paycheck, and a year-end bonus. The total of these payments was $399,000.

On July 22, 1980, plaintiff commenced the present action against the clinic for breach of his contract of employment by reason of the premature termination thereof and against Dr. Graether for causing such breach through tortious interference with a contractual relationship. All issues in the case were initially determined adversely to the plaintiff by rulings on motions for summary judgment. Those rulings were reversed in an earlier appeal in this action which was heard and decided by the court of appeals in December of 1982.

Following remand by the court of appeals, both defendants filed supplemental motions for summary judgment which were denied. The case was tried to a jury in December of 1984. Plaintiff testified at trial that had his employment not been terminated on June 30, 1980, he would have been able to continue working for the clinic in the same or similar capacity indefinitely. He indicated that his compensation at the rate he had been receiving at the time of termination would have been sixty-five percent of that paid a surgeon who took the same amount of vacation time. Evidence was offered that, for the last three fiscal years for which those figures had been made available to plaintiff, *i.e.*, 1980–81, 1981–82, 1982–83, those surgeons would have received $487,392, $638,653 and $823,025.

Verdicts were returned in favor of the plaintiff and against the clinic for $4,476,691 in actual damages and in favor of the plaintiff and against Dr. Graether for $4,476,691 in actual damages and $2,238,000 in punitive damages. We separately consider the several assignments of error which the defendants raise in appealing from these judgments. Other significant facts which bear upon our disposition of these appeals are stated and considered in our discussion of the legal issues which are presented.

I. *The Clinic's Appeal.*

The clinic urges in support of a reversal of the judgment against it that its motion for directed verdict should have been sustained by the trial court.

A. *Motion for Directed Verdict.* The primary ground of the clinic's motion for

directed verdict was that, viewing the evidence most favorably to the plaintiff, his employment agreement is indefinite as to time and therefore terminable at the will of either party. In the alternative, the motion for directed verdict asserts that it appears without dispute in the evidence that the clinic was legally entitled to terminate plaintiff's employment under the provisions of his contract relating to involuntary retirement and termination due to an intolerable employment situation.

The legal issues on which both the primary and alternative grounds of this motion are based were considered by the court of appeals in an earlier appeal in this action. That appeal was taken from an initial determination of the district court dismissing plaintiff's claims on a motion for summary judgment. On the present appeal, the parties make conflicting claims concerning the effect to be accorded the decision of the court of appeals reversing the order granting summary judgment. Some consideration of the earlier appeal and the proceedings leading up to it is therefore necessary.

1. *The First Motion for Summary Judgment.* In February of 1981, the clinic filed a motion for summary judgment seeking dismissal of the breach of contract claim. This motion was based on a single ground, *i.e.,* that it appeared without dispute from the pleadings and affidavits on file that, in terminating plaintiff's employment, "it exercised its lawful right under the provisions of [section 3 of the employment contract] to retire the plaintiff involuntarily." In support of that contention, the clinic submitted (1) copies of plaintiff's written employment agreement, including the portions thereof previously set forth in this opinion, (2) the resolution of the clinic's board of directors dated February 4, 1980, resolving that "Dr. Henry Wolfe is subject to involuntary retirement," and (3) proof of service of notice on plaintiff of the action thus approved. The February 4, 1980 resolution of the board also characterized plaintiff's employment as "indefinite in duration" and spoke of an "intolerable" employment situation, but the motion for summary judgment only raised the issue of involuntary retirement under the first unnumbered paragraph of section 3 of plaintiff's written employment agreement.

The district court, acting through a judge other than the one who ultimately tried the case, granted the motion for summary judgment on the basis that plaintiff had been involuntarily retired in accordance with the agreement. The court's ruling on the motion for summary judgment also appeared to hold that the clinic was justified in terminating plaintiff's employment agreement under section 12 (the intolerability clause) and because the agreement was indefinite as to time and therefore "terminable at the will of either party."

On appeal from the granting of summary judgment, the court of appeals concluded that there was a genuine issue of material fact concerning the proper interpretation of "involuntary retirement" under plaintiff's written employment contract and that this term might be interpreted in a manner which would give rise to yet another genuine issue of material fact concerning whether the facts justified the action which was taken by the clinic. The court of appeals also discussed the issues of employment at will and termination based on an intolerable employment situation, which the district court had raised sua sponte in its order. The court concluded on the record before it that genuine issues of material fact also existed with respect to whether plaintiff's employment had been properly terminated on these grounds. Consideration of all of these issues appears to have been necessary in view of the fact that the plaintiff did not challenge the sua sponte action of the district court and assumed the burden of attacking all of that court's ruling on the merits.

Both the defendants and the plaintiff asked this court for further review of the court of appeals decision. We granted further review for the limited purpose of declaring that the court of appeals decision should be interpreted as providing for reversal of the judgment in favor of defend-

ant Graether as well as the judgment in favor of the clinic.[1]

■ 2. *Law of the Case Aspects of the First Appeal.* Both the appellants and the appellee contend that there are "law of the case" implications in the decision of the court of appeals which favor their respective positions in the present appeal. We have previously determined that, where the court of appeals has determined an issue of law necessary to the decision of a prior appeal, and its determination is not vacated by this court, the decision of that court is controlling as to that issue for purposes of further proceedings in both the district court and subsequent appeals. *Omaha Bank for Cooperatives v. Siouxland Cattle Cooperative*, 305 N.W.2d 458, 463 (Iowa 1981). This principle applies notwithstanding the fact that a subsequent appeal may be considered by this court. *Id.; Gore v. Bingaman*, 20 Cal.2d 118, 123, 124 P.2d 17, 19 (1942); 5 Am.Jur.2d *Appeal & Error* § 747, at 191 (1962) ("[A] decision of an intermediate appellate court is binding also on a higher appellate court on a subsequent appeal in the same case.").

■ While we have sometimes referred to the decision on the former appeal as being "res judicata," it is more accurately described as being "the law of the case." While these two principles are analogous, they are not the same. In 46 Am.Jur.2d *Judgments* § 400, at 568 (1969), it is stated that

> [b]oth doctrines are founded on a public policy against reopening that which has previously been decided. However, the doctrine of the law of the case is not identical with the doctrine of res judicata, but differs in many important respects, and is distinguishable therefrom. The doctrine of the law of the case is more limited in its application, inasmuch as the doctrine of res judicata is not confined to matters of law, but is concerned exten-

sively with issues of fact, and is not ordinarily concerned with subsequent proceedings in the same case, but with subsequent independent actions between the same parties or their privies.

(Footnotes omitted.) The general understanding of the doctrine of the law of the case is that it applies only to so much of an opinion by an appellate court in a former decision in the same case as was essential to the determination required of the court. *Barney v. Winona & St. Peter Railroad Co.*, 117 U.S. 228, 231, 6 S.Ct. 654, 657, 29 L.Ed. 858, 860 (1886) (The law of the case doctrine "does not apply to expressions of opinion on matters the disposition of which was not required for the decision.").

■ Questions involving the sufficiency of evidence to withstand a motion for summary judgment or to generate a submissible jury issue in the face of a motion for directed verdict present issues of law. *Jones v. City of Sioux City*, 192 Iowa 99, 102, 182 N.W. 644, 645 (1921). The similarities between motions for summary judgment and motions for directed verdict, *see Meyer v. Nottger*, 241 N.W.2d 911, 917 (Iowa 1976), suggest that appellate decisions concerning the former will often carry law of the case implications with respect to the latter if the evidentiary basis for the court's rulings is sufficiently similar. *Beeck v. Aquaslide 'N' Dive Corp.*, 350 N.W.2d 149, 154–55 (Iowa 1984).[2]

The clinic contends that the court of appeals decision on the first appeal determined as a matter of law that plaintiff's contract of employment was terminable at will by either party. We find it impossible to accommodate this suggestion with the holding of the court of appeals reversing the order granting summary judgment. Had this been the conclusion of the court, it would have required an affirmance of that order. The clinic's argument takes out of context the language of the court of appeals referring to the agreement as indefi-

---

1. The basis for that determination is further discussed in footnote 5 *infra*.

2. To the extent that the errors assigned with respect to the ruling on the motion for directed verdict are not dispositive of the case, we will consider other law of the case issues which apply to the assigned errors on the jury instructions.

nite in duration and terminable at will. The court was merely stating, we believe, the rule which we discuss later in this opinion that this type of agreement will not be interpreted as calling for permanent employment in the absence of some consideration additional to the furnishing of the services which the employee is hired to perform.

On the issue of whether the employment agreement was terminable at will, the court of appeals determined that (a) based on the pleadings and affidavits, an agreement for permanent employment could have been intended, and (b) the required additional consideration could be found to exist, based on plaintiff's relinquishment of his partnership interest in order to enable the professional corporation to be formed. It did not purport to finally determine the intent of the parties as to the duration of plaintiff's employment.

■ On the issues involving the question of termination based on involuntary retirement or an intolerable employment situation, we view the court of appeals decision as only recognizing that extrinsic evidence could be considered in interpreting what the contract called for in these clauses. The decision reversing the district court was based in part on a failure of the defendants to negate a genuine issue of material fact based on such extrinsic evidence. We agree that extrinsic evidence may be considered by the trier of fact in resolving these issues of contract interpretation. Because much of that evidence was not before the court of appeals at the summary judgment stage of this litigation, its decision on these issues has little direct application to the determinations required to be made in regard to the motion for directed verdict.

We do not interpret the court of appeals decision as fixing for further purposes in the litigation the meanings to be accorded to the voluntary retirement or "intolerability" clauses of the contract. It was not necessary to do this in order to reverse the district court's grant of summary judgment. It would have been inappropriate to permit the meaning of these clauses to be irrevocably established prior to the time that the interpretation issues involving permanent employment were resolved. Whether or not plaintiff was assured permanent employment could logically play a major role in determining the meaning which the trier of fact ascribed to other features of the employment relationship, including those provisions of the agreement dealing with the clinic's right to terminate that relationship.

■ 3. *Evidence in Support of Agreement for Permanent Employment.* The clinic urges that the evidence presented at trial was insufficient as a matter of law to permit a determination that plaintiff's employment contract was not of indefinite duration and, as such, terminable at will. In our recent decision in *Albert v. Davenport Osteopathic Hospital,* 385 N.W.2d 237, 238–39 (Iowa 1986), we review some of the legal principles which apply in resolving claims alleging contracts of permanent employment. Among these principles are the following. An at-will employee may be terminated at any time, for any reason. *Abrisz v. Pulley Freight Lines, Inc.,* 270 N.W.2d 454, 455 (Iowa 1978); *Harper v. Cedar Rapids Television Co.,* 244 N.W.2d 782, 791 (Iowa 1976). In a contract of employment which by its express terms is for a definite time or to last until a definite day, the employer may not discharge an employee prior to the stated time unless cause is shown based upon the employee's failure to perform in accordance with the contract of hire or there is some reason for discharge expressly provided in the contract. *Allen v. Highway Equipment Co.,* 239 N.W.2d 135, 140 (Iowa 1976). Contracts expressly offering lifetime or permanent employment or which a trier of fact has interpreted as offering such employment based on extrinsic evidence will be interpreted as indefinite and terminable at will in the absence of some executed consideration in addition to the services to be rendered. *Id.* at 140; *Stauter v. Walnut Grove Products,* 188 N.W.2d 305, 311 (Iowa 1971); *Lewis v. Minnesota*

*Mutual Life Insurance Co.,* 240 Iowa 1249, 1263, 37 N.W.2d 316, 324 (1949). The question of what constitutes sufficient additional consideration must be determined on a case-to-case basis. *Albert,* 385 N.W.2d at 238.

The court of appeals determined that sufficient additional consideration could be found in the relinquishment by plaintiff of his status as an equal partner in the clinic to become an employee of the professional corporation. It stated in this regard that: "[t]he privileges and protections afforded a partner are considerably more than those afforded an employee in an employment relationship which is terminable at will." In seeking to overcome this determination by the court of appeals, the clinic points out that plaintiff had urged to that court that additional consideration could be found in his relinquishment of a right to share in the distribution of partnership assets upon becoming an employee of the professional corporation.

The clinic correctly notes that the evidence presented at trial does not reflect that plaintiff actually gave up any right to partnership assets. The buildings and equipment of the clinic while it was a partnership were not owned by the partnership but by a separate corporation. Plaintiff maintained the same interest in that corporation following the change of the clinic operation to a professional corporation. Moreover, any share of cash in accounts receivable which plaintiff might have enjoyed upon dissolution of the partnership was preserved to him under his contract of employment with the newly-formed professional corporation. Neither of these circumstances had been made known to the district court or court of appeals in regard to the first motion for summary judgment.

▆ The differences in the evidence at trial and that before the court of appeals on the motion for summary judgment require plaintiff to establish the necessary additional consideration on some basis other than relinquishment of partnership assets. Notwithstanding this circumstance, we believe that he has done so. The situation is not, as the clinic suggests, similar to *Laird v. Eagle Iron Works,* 249 N.W.2d 646, 648 (Iowa 1977) where an employee exchanged one employment of indefinite duration for another. Although the members of the partnership could have dissolved it at any time by majority vote, plaintiff, at the time that incorporation was being considered, may well have enjoyed de facto permanent employment with the partnership by reason of family control. At the time the supposed assurances of permanent employment were given, Wolfe family members constituted a majority of the partners. In addition, plaintiff would have had a right to vote on any proposal to alter his status as a partner and participate in discussions held at any meeting where such vote was taken. As an employee of the professional corporation, he did not enjoy similar rights. If the transaction was as plaintiff testified, his forbearance was legally sufficient to satisfy the requirement for additional consideration.

We also conclude that an issue of fact was presented as to the proper interpretation of the agreement upon which plaintiff relies. The precise intentions of parties to employment agreements are often left unexpressed. In 3A A. Corbin, *Contracts* § 684, at 224 (1960), the author recognizes this fact and states:

[B]oth of them [the employer and the employee] may understand that the hiring is for a definite period. The circumstances may be evidential of such an understanding, even though the express words, standing alone, would not bear such an interpretation.... [O]ne of the parties (usually the employee) may have had in mind a definite period of employment and the other party had not. Here there is no actual "meeting of the minds"; and yet there may be a valid contract. Interpreting the elliptical expressions of the parties, the court may find that the expressions, interpreted in the light of the surrounding facts, made the understanding of one of the parties reasonable and made it unreasonable for the other party not to know that such

would be the first party's understanding. In such a case, there is a contract in accordance with that understanding.

There is ample evidence in the present case that the change to a professional corporation was of immeasurable benefit to the other partners. It is impossible to know how plaintiff would have reacted had the alleged assurances of permanent employment not been made to him. From the evidence, the jury could have found that these assurances had been made and plaintiff relied upon them by acquiescing in the proposed change of business organization. That scenario, we believe, could generate a contract for permanent employment under our case law.

4. *Termination of the Contract in Accordance With Its Terms.* We also reject the clinic's contention on appeal that it appears as a matter of law that the contract was properly terminated in accordance with its terms. If the jury believed that the facts which existed in 1969 and 1970 support plaintiff's view as to a contract of permanent employment, it would not be unreasonable for it to also interpret the language of the 1973 agreement as conditioning termination of that employment upon a satisfactory showing that he was no longer able to perform the work assigned to him or that his efforts were otherwise upsetting to the operation of the clinic.

While there certainly is evidence from which the trier of fact could find against plaintiff on these issues, we believe the circumstances would also permit a finding in his favor. Among the items of evidence which would support the latter finding, was the apparent willingness of the board of directors to have plaintiff remain as business manager while he trained a successor, and then remain on the payroll in some other capacity. That circumstance could be viewed as inconsistent with the belief that the situation surrounding plaintiff's employment was truly intolerable or that he was a fit subject for involuntary retirement. We find no basis for concluding that the trial court erred in not direct-

ing a verdict in favor of the clinic on plaintiff's claims against it.

B. *Parole Evidence Rule.* The clinic asserts that the extrinsic evidence which plaintiff offered concerning the circumstances surrounding the conversion of the partnership to a professional corporation is legally inoperative to support his claims in the present action. It makes a similar contention with respect to plaintiff's testimony as to the interpretation which he placed on the provisions of his written employment agreement as a result of assurances allegedly made to him. As support for these contentions, the clinic cites and relies on *Montgomery Properties Corp. v. Economy Forms Corp.,* 305 N.W.2d 470 (Iowa 1981) involving the use of extrinsic evidence in litigation involving "integrated" agreements. We disagree with the clinic's contention for two reasons. First, the holding in *Montgomery Properties Corp.* was expressly limited to "handcrafted" contracts between parties of equal bargaining strength. *Id.* at 476. Second, and of more significance we believe, is that nothing contained in the *Montgomery Properties Corp.* decision limits the use of parole evidence for purposes of interpreting a written agreement.

Clearly, the extrinsic evidence offered on the issues of what was intended by the contract clauses permitting termination by involuntary retirement or where the employment situation was intolerable was for purposes of interpretation. In addition, the purpose of the extrinsic evidence offered in support of the claimed additional consideration required under our cases is an aid to the interpretation of the agreement's duration. While the language of our cases does not always recognize the distinction, we believe the better view to be that the so-called "additional consideration" requirement applied in contracts of permanent employment is not truly a rule of consideration in the traditional sense, but rather an adjunct rule of interpretation. As such it is not strictly governed by those principles of contract law applicable to the

sufficiency of consideration required to enforce a promise. Cases such as *Hubbard Milling Co. v. Citizens State Bank*, 385 N.W.2d 255, 258–59 (Iowa 1986) involving general principles of contract consideration are therefore not helpful to the clinic in its effort to minimize the legal effect of the extrinsic evidence.

In 3A A. Corbin, *Contracts* § 684, at 228–29 n. 41 (1960), the author asserts the view that the additional consideration element is to be utilized in the determination of what the parties intended. He discusses our decision in *Thompson v. Miller*, 251 Iowa 324, 100 N.W.2d 410 (1960) as illustrative of that conclusion. In *Thompson*, we determined that:

> The question is then: does the contract involved provide permanent or lifetime employment to plaintiff ...? What did the parties intend when the contract was entered into? Was a lifetime contract then within the contemplation of the parties?
>
> ... In this case more is involved than mere services. Plaintiff paid half of the advertising and sales costs and all of his traveling expenses. He thus had a capital as well as a labor investment.

251 Iowa at 327, 100 N.W.2d at 412.

In deciding the clinic's parole evidence claims, we are guided by the standard contained in Restatement (Second) of Contracts § 212(2) (1981) which provides:

> A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence.

We have applied this standard in determining the meaning of words in a written agreement, *Farm Bureau Mutual Insurance Co. v. Sandbulte*, 302 N.W.2d 104, 107–08 (Iowa 1981) and *Connie's Construction Co. v. Fireman's Fund Insurance Co.*, 227 N.W.2d 207, 210 (Iowa 1975), and in determining the meaning of the parties within the context of the transaction. *First National Bank of Creston v. Creston Implement Co.*, 340 N.W.2d 777, 782 (Iowa 1983); *Hamilton v. Wosepka*, 261 Iowa 299, 305–10, 154 N.W.2d 164, 167–69 (1967). We find no error in the utilization of parole evidence in the trial of the present claims.

C. *Jury Instructions on Permanent Employment.* In instructing the jury on the elements of plaintiff's breach of contract claim against the clinic, the trial court gave seriatim marshaling instructions. These were Instruction No. 13 and Instruction No. 14, which provided:

### INSTRUCTION NO. 13

Wolfe first claims that the Clinic breached the employment contract entered into by the parties in 1973 (Exhibit 23) and that he is entitled to recover damages resulting from that breach. In order to prevail on this claim, Wolfe must prove each of the following propositions by a preponderance of the evidence:

1. That the Clinic breached the said contract by terminating Wolfe's employment in 1980, as further explained in Instruction No. 14; and

2. That Wolfe suffered damages in some amount as a result of such breach, as further explained in Instruction No. 18.

If you find that Wolfe has proven both of these propositions by a preponderance of the evidence, then he is entitled to recover on his claim against the Clinic for breach of contract; otherwise, he is not so entitled.

### INSTRUCTION NO. 14

With regard to proposition No. 1 set forth in Instruction No. 13, the burden is upon Wolfe to prove by a preponderance of the evidence that the Clinic breached his employment contract. To carry that burden Wolfe must establish each of the following elements by a preponderance of the evidence:

(a) That the Clinic did not act in good faith in declaring Wolfe's employment situation to be "intolerable," as explained further in Instruction No. 15;

(b) That the Clinic did not have sufficient basis for "involuntarily retiring" Wolfe, as explained further in Instruction No. 16; and

(c) That Wolfe provided "additional consideration" for a contract for permanent employment, as explained further in Instruction No. 17.

If Wolfe has proved all of these elements by a preponderance of the evidence, then he has proven proposition No. 1 set forth in Instruction No. 13 and you shall proceed to consider the amount of Wolfe's damages, if any, as explained in Instruction No. 18. If Wolfe has failed to prove one or more of the above elements, then he has not proven proposition No. 1 set forth in Instruction No. 13 and your verdict will be in the Clinic's favor on Wolfe's claim for breach of contract.

In Instruction No. 17, the trial court told the jury that one provision of the contract—that its term "shall be from the date hereof to the date of death of the Employee or his retirement, or permanent disability"—would constitute a contract terminable at will unless plaintiff had provided the additional consideration specified in Instruction No. 14(c). Instruction No. 17 went on to state: "If you find that [plaintiff] supplied the 'additional consideration' described above, you will conclude that he has proven element (c) set forth in Instruction No. 14." Instruction No. 18 instructed the jury with respect to its determination of plaintiff's loss of compensation both prior to and subsequent to the trial of the case.

The clinic urges that these instructions are erroneous in that they peremptorily declare the existence of a contract of permanent employment as a matter of law in the event that the claimed additional consideration is found to exist. As a result, the clinic urges, the verdict in the present case was attained without having either the court or jury resolve the paramount issue of interpretation upon which plaintiff's claim depended.

Although the clinic, at trial, challenged the sufficiency of the evidence to permit the jury to consider whether there was a contract of permanent employment, it offered requested jury Instructions 8a, 8b,

and 9 to be given in the event it was unsuccessful in establishing that contention. Requested Instruction No. 8a provided, in part:

*REQUESTED INSTRUCTION NO. 8a*

In this case, Plaintiff contends that the employment agreement dated July 1, 1973, was a contract for lifetime employment. The Plaintiff has the burden of proof on this contention. The Clinic denies this contention.

Both Plaintiff and the Clinic have introduced evidence on the issue of whether the parties intended the language of the Plaintiff's July 1, 1973 employment agreement to provide Plaintiff employment for the duration of his life. As the finders of fact in this case, it is your duty to interpret the contract in light of all the evidence to determine whether it is one intended to extend for the Plaintiff's lifetime or whether it is one which is indefinite as to its term.

In interpreting the employment agreement in light of all the evidence, you should read and interpret the contract as an entirety and give effect to the language of the entire contract in accordance with its commonly accepted and ordinary meaning.

Requested Instruction No. 8b provided that, if the jury concluded that plaintiff had *failed* to establish a contract of permanent employment, then the contract was terminable at the will of either party at any time for any reason. In the alternative, Requested Instruction No. 9 provided that, if the jury should find that plaintiff *had* established a contract of permanent employment, it must then consider the issue of the required additional consideration. The clinic took timely exception under Iowa Rule of Civil Procedure 196 to the trial court's failure to submit the issue of permanent employment in accordance with its requested instructions. This exception was overruled by the trial court, and the issue of permanent employment was submitted in accordance with those instructions previously set forth in our discussion.

 We agree with the contention that an affirmative finding on whether additional consideration had been given is not determinative of the issues surrounding interpretation of the agreement. Additional consideration is an essential element of a contract for permanent employment.[3] Such additional benefit or forbearance does not create that status, however, unless this was the intention of both the employer and the employee, or, unless this was the employee's intention and the employer should reasonably have known that it was. *Thompson,* 251 Iowa at 327, 100 N.W.2d at 412; Iowa Code § 622.22 (1983); 3A A. Corbin, *Contracts* § 684, at 224 (1960). The clinic's requested instructions sufficiently apprised the trial court that an issue of interpretation remained for the jury on these questions.[4] The instructions which were given neither required nor permitted the jury to consider these essential issues. This omission requires reversal on the clinic's appeal.

This error in the instructions to the jury requires a new trial of all of the issues surrounding the plaintiff's claim against the clinic.

D. *The Clinic's Breach of Contract Claim.* Because of the likelihood that this issue will arise again on a second trial, we consider the claim lodged by the clinic that the termination of plaintiff's employment was justified as a result of his own breach of the agreement of hire. This contention was asserted as an affirmative defense in the clinic's answer.

 While we agree that, even as to contracts for a definite duration or for life, an employee may be discharged for cause, and that such cause may exist upon grounds not expressly stated in the contract, *see Miller v. Jones,* 178 Iowa 168, 172, 159 N.W. 671, 672 (1916); 53 Am.

Jur.2d *Master & Servant* § 45, at 120 (1970), we conclude that the record reveals no basis upon which the clinic may prevail on this theory in the present case.

The plaintiff submitted a proposed instruction (No. 14) which provided, in part:

The Clinic has introduced evidence that Plaintiff refused to accept a request of the Clinic in late 1979 that he perform different duties at reduced compensation for the professional corporation. Plaintiff responded to the request with a counter-proposal relating to the duties which he would be willing to perform. Plaintiff's position was further stated to include his intentions to work for the Clinic only under the terms of his counter-proposal or in the same capacity and at the same scale of compensation as he had in the past. Plaintiff further stated that any attempt to reduce his compensation would be tantamount to termination. Thereafter, Plaintiff was served a notice of termination.

The Clinic contends that in announcing his position that any reduction in his compensation would be tantamount to termination, the Plaintiff committed a breach of the employment agreement by refusing to recognize the right of Wolfe Clinic, P.C., to reduce his compensation in accordance with its avowed intent. The Clinic further contends that the Plaintiff's refusal to perform those during designated by the Clinic in the proposal constituted a breach of his employment agreement. Accordingly, it is the Clinic's contention that the Plaintiff and not the Clinic breached the employment agreement, thereby giving the Clinic the right to terminate the Plaintiff's employment.

 On the evidence produced at trial, we believe that the factual predicate for giving this instruction was absent. The

---

3. The sufficiency of the consideration in order to permit a finding of permanent employment is an issue of law for the court. Whether the claimed additional consideration was in fact rendered is an issue of fact for the jury. *Albert,* 385 N.W.2d at 239; *Thompson,* 251 Iowa at 327; 100 N.W.2d at 412.

4. The only significant area in which we disapprove the language of the clinic's proposed instructions on interpretation is their reference to employment for life. We find the trial court's use of the term "permanent employment" to be preferable.

request made to plaintiff to perform different duties at reduced compensation was not made to him in the form of a management directive under his existing contract. Instead, the evidence indicates that plaintiff was approached on the basis of the clinic negotiating a different employment agreement. Plaintiff's failure to negotiate, under the circumstances, will not support a claim against him for breach of contract.

## II. *Defendant Graether's Appeal.*

At the outset of our consideration of Dr. Graether's appeal, we are confronted with the question of the effect of the reversal of the judgment against the clinic upon the judgment against him. Graether argues that:

> [plaintiff's] claim against Graether for intentional interference with contractual relations was predicated on the allegation that Graether induced the Clinic to breach its contract with [plaintiff]. Thus, if there was no breach of contract by the Clinic, there was also no interference with contractual relations by Graether.

From this premise, Graether urges that retrial of the breach of contract issues with respect to the clinic requires retrial of the tortious interference claim against him.

■ A. *Interrelationship of Breach of Contract Issues and Tortious Interference Issues.* In reviewing the allegations of plaintiff's petition, it appears that the gravamen of his claim is that Dr. Graether's conduct constituted intentional interference with plaintiff's contractual relationship. While it is alleged that this resulted in a breach of plaintiff's employment contract, proof of that allegation, we believe, is not essential to establish a claim for tortious interference under our decision in *Toney v. Casey's General Stores, Inc.*, 372 N.W.2d 220, 222 (Iowa 1985). In that decision, we recognize that inducing the termination of an existing contractual relation-

ship may be actionable even though a breach of contract does not thereby occur. We therefore believe that plaintiff's petition states a valid claim without regard to whether a breach can be established. A party is not required to prove more than is necessary to entitle that party to the relief requested, or any lower degree of relief included therein. *Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 131 (Iowa 1983); Iowa Code § 619.9 (1983).

Dr. Graether contends that the plaintiff has conceded that a breach of contract by the clinic is an essential element of his claim against Graether. This contention is predicated on a recital in the district court's ruling on the first motion for summary judgment which states that plaintiff agreed that, in the absence of a breach of contract by the clinic, he had no claim against Graether. We can find no basis in the record for extending this stipulation beyond the disposition of those motions to which it related.[5] Any continuing effect thereof was broken, we believe, by the trial court's instructions to the jury which do not appear to include a breach of contract by the clinic as an element for establishing liability against Graether on the tortious interference claims.

Notwithstanding our rejection of Graether's argument that a breach of contract by the clinic was an element of plaintiff's claim against him, we agree that, in instructions to the jury on both the liability and damage issues against Graether, the trial court tied those issues to the breach of contract issues in several material respects.

■ 1. *Liability Issues.* One of the issues submitted concerning Graether's liability to the plaintiff was his claim that his actions with respect to the termination of plaintiff's contract were privileged. In instructing on this privilege, the trial court in Instruction No. 23 conditioned the privilege on a showing by Graether that (a) he acted

---

5. This stipulation in connection with the first motion for summary judgment was the sole basis of the district court's order dismissing the claims against Dr. Graether. The significance of this occurrence was not considered by the

court of appeals but was the reason for our limited grant of further review on the first appeal in order to clarify whether the judgment had been reversed as to both defendants or only as to the clinic.

to protect his own financial interest from being prejudiced, and (b) he did not employ proper means. In instructing the jury on how to determine whether improper means had been employed, the trial court in Instruction No. 25 required consideration of several factors. Two of these factors were: (a) the interests of the plaintiff with which Graether's conduct interfered, and (b) the social interests in protecting the freedom of action of Graether and the contractual interests of the plaintiff. We believe that in order to give meaningful consideration to these factors it was necessary for the jury to first know whether the plaintiff's employment was at will or, as he alleged, was permanent. Because the jury was improperly instructed as to how to determine which of these situations prevailed, this materially affected its ability to consider Graether's claim of privilege in accordance with the trial court's instructions.

In *Christensen v. Sheldon*, 245 Iowa 674, 686, 63 N.W.2d 892, 899–900 (1954), we recognized the distinction which exists between those cases where judgments against multiple parties are reversed for errors established by all appellants as to certain issues and cases where judgments are reversed as a result of errors committed against some parties but not against others. We indicated that, in a proper case, the reversal of a judgment against all parties for errors committed against only some parties is permissible. Quoting from 5 C.J.S. *Appeal & Error* § 1919 (now found in 5B C.J.S. *Appeal & Error* § 1919, at 411 (1958)), we stated that this may occur where "the cause of action is of such a nature that the rights and issues are interdependent and injustice might result from a reversal as to less than all the parties." We conclude that this is a case in which that principle should be applied. The errors which affected the jury's ability to determine the breach of contract issues also require reversal with respect to the tortious interference issues.

■ 2. *Damage Issues.* In instructing the jury on damages against Graether,

the trial court advised the jury in Instruction No. 27 that plaintiff's damages for actual loss caused by Graether's intentional interference would be the same as the damages determined in his claim against the clinic for breach of contract. We do not agree with this conclusion if, on the liability issues against Graether, the jury determined liability on the basis of a tortious interference with an at-will relationship. For many reasons, a jury might conclude that the expectancy of an at-will employee in regard to future compensation would be less than that of a permanent employee. This distinction further supports our determination that the issues against Graether must also be retried.

B. *Instructions on the Elements of the Claim and Applicable Privileges.* Because the issues against Graether are required to be retried, we consider certain of those issues raised in the present appeal which might arise at a second trial. Graether contends that, in instructing on the elements of the tortious interference claim against him, the trial court should have instructed the jury that plaintiff was required to show that the acts of interference were "improper" as well as intentional. This contention is in keeping with the changes which occurred in the American Law Institute's Restatement (Second) of Torts between the fourteenth tentative draft of the material in chapter 37 and the final edition. The elements of business interference torts approved by this court in *Farmers Cooperative Elevator, Inc., Duncombe v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1975) were based on the fourteenth tentative draft and antedated the final edition. Iowa Uniform Jury Instructions 28.1, 28.2, 28.4, 28.5 and 28.6 employed the language used in our decisions rather than those contained in the final edition of the Restatement.

Historical comments accompanying the final edition of the Restatement indicate that the change in language was designed largely to accommodate differences of opinion over burden of proof, a matter concerning which the Institute expressed some am-

bivalence. *See* Restatement (Second) of Torts § 767 comment b, 27–28 (1979); Perlman, *Interference With Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi. L.Rev. 61, 67 (1982). The trial court understandably viewed the issue as one of stare decisis. Accordingly, it relied on the language of our earlier decisions as fixing the elements of the interference tort rather than the later action of the American Law Institute. Basically, we are sympathetic with the trial court's approach. On the facts of the present case, we believe the language of the trial court's instructions would have been adequate had proper instructions also been given on the element of privilege.

On the latter issue, Graether requested that the court instruct the jury that his actions were privileged if, in seeking termination of plaintiff's contract, he was acting in his capacity as an officer or director of the professional corporation. The trial court declined to give such an instruction, although it did instruct the jury concerning the privilege of protecting one's own financial interest as recognized in Restatement (Second) of Torts § 769, at 44 (1979).[6]

▮▮▮ Based on the views which we expressed in *Bossuyt v. Osage Farmers National Bank,* 360 N.W.2d 769, 778–79 (Iowa 1985) and *Bump v. Stewart, Wimer & Bump, P.C.,* 336 N.W.2d 731, 737 (Iowa 1983), we conclude that, if, on retrial of this action, Graether again requests an instruction on the qualified privilege of corporate officers and directors to act with respect to corporate matters, such instruction should be given. The substance of such an instruction would more accurately present the legal effect of the special relationships of the parties in the present case than an instruction on the financial interest privilege.

C. *Graether's Motion for Directed Verdict.* The fact that errors in the trial of the case against the clinic require retrial of the claims against Graether does not per-

mit us to ignore those issues on appeal which involve Graether's motion for directed verdict. If he is successful on these issues, there will be no basis for retrial of any claims against him. For reasons which follow, however, we conclude that Graether's motion for directed verdict was properly denied by the trial court.

One of the matters relied upon by the plaintiff in support of his claim against Graether involves a threat made by the latter to end his professional association with the clinic if plaintiff's existing contractual relationship was not terminated. There is some evidence in the record that this action was taken by Graether and had an impact on the other directors. Graether denied that he ever made such threats. In Graether's argument, he likens the present case factually to *Bump v. Stewart, Wimer & Bump, P.C.,* 336 N.W.2d at 737, where tortious interference claims arising from the activities of a professional corporation were rejected by the court. We did not determine in *Bump* that the evidence failed, as a matter of law, to establish a prima facie case. The claim had been rejected by the district court as trier of fact in an equity action. That decision was upheld on appeal based on this court's de novo review of the facts under Iowa Rule of Appellate Procedure 4.

Although the planned withdrawal of certain members of the firm was one of the circumstances involved in *Bump,* it was found that this had not been utilized to interfere with existing contractual relationships of third parties. On the record in the present case, the question of whether the alleged threats were made by Graether and, if so, whether such action was designed to interfere with the clinic's existing contractual relationship with plaintiff, is a determination which must be made by the trier of fact.

▮▮▮ Assuming that Graether's own employment relationship with the clinic was a contract at will, this fact would not prevent a finding that such threats on his part, if they were made, were threats of sub-

---

**6.** This privilege is recognized in the Restatement as being applicable to interference with prospec-

tive contractual relationships rather than existing contractual relationships.

stantial economic reprisal against the clinic. The evidence shows Graether to be a widely-acclaimed surgeon and a valuable asset to the clinic. Threat of economic reprisal is a recognized basis for permitting recovery in tortious interference cases. *Lipman v. Brisbane Elementary School District,* 55 Cal.2d 224, 359 P.2d 465, 11 Cal.Rptr. 97 (1961); *Piedmont Cotton Mills, Inc. v. H.W. Ivey Construction Co.,* 109 Ga.App. 876, 137 S.E.2d 528 (1964); *Knickerbocker Ice Co. v. Gardiner Dairy Co.,* 107 Md. 556, 69 A. 405 (1908); *Smith v. Ford Motor Co.,* 289 N.C. 71, 221 S.E.2d 282 (1976); *see generally* 45 Am.Jur.2d *Interference* § 16, at 293 (1969). Such action could be viewed by the trier of fact as an activity not in keeping with the fiduciary role of a corporate officer or director. The motion for directed verdict was properly denied.

The judgment entered on Count III of the petition was not involved in this appeal and is unaffected by the disposition of those issues which were raised on appeal. Otherwise the judgment of the district court is reversed, and the case is remanded for retrial of all issues on both the breach of contract claim and the tortious interference claim.

REVERSED AND REMANDED ON BOTH APPEALS.